# RICHMOND NEWSPAPERS, INC., ET AL. *v.* VIRGINIA ET AL.

No. 79–243.   Argued February 19, 1980—Decided July 2, 1980

556

558

BURGER, C. J., announced the Court's judgment and delivered an opinion, in which WHITE and STEVENS, JJ., joined. WHITE, J., *post*, p. 581, and STEVENS, J., *post*, p. 582, filed concurring opinions. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, *post*, p. 584. STEWART, J., *post*, p. 598, and BLACKMUN, J., *post*, p. 601, filed opinions concurring in the judgment. REHNQUIST, J., filed a dissenting opinion, *post*, p. 604. POWELL, J., took no part in the consideration or decision of the case.

*Laurence H. Tribe* argued the cause for appellants. With him on the briefs were *Andrew J. Brent, Alexander Wellford, Leslie W. Mullins,* and *David Rosenberg.*

*Marshall Coleman,* Attorney General of Virginia, argued the cause for appellees. With him on the brief were *James E. Moore, Leonard L. Hopkins, Jr., Martin A. Donlan, Jr.,* and *Jerry P. Slonaker,* Assistant Attorneys General.*

MR. CHIEF JUSTICE BURGER announced the judgment of the Court and delivered an opinion, in which MR. JUSTICE WHITE and MR. JUSTICE STEVENS joined.

The narrow question presented in this case is whether the right of the public and press to attend criminal trials is guaranteed under the United States Constitution.

---

*Briefs of *amici curiae* urging reversal were filed by *John J. Degnan,* Attorney General, and *John De Cicco, Anthony J. Parrillo,* and *Debra L. Stone,* Deputy Attorneys General, for the State of New Jersey; by *Stephen Bricker* and *Bruce J Ennis* for the American Civil Liberties Union et al.; by *Arthur B. Hanson, Frank M. Northam, Mitchell W. Dale,* and *Richard M. Schmidt, Jr.,* for the American Newspaper Publishers Association et al.; by *E. Barrett Prettyman, Jr., Erwin G. Krasnow, Arthur B. Sackler,* and *J. Laurent Scharff* for The Reporters Committee for Freedom of the Press et al.; and by *Edward Bennett Williams, John B. Kuhns,* and *Kevin T. Baine* for The Washington Post et al.

# I

In March 1976, one Stevenson was indicted for the murder of a hotel manager who had been found stabbed to death on December 2, 1975. Tried promptly in July 1976, Stevenson was convicted of second-degree murder in the Circuit Court of Hanover County, Va. The Virginia Supreme Court reversed the conviction in October 1977, holding that a bloodstained shirt purportedly belonging to Stevenson had been improperly admitted into evidence. *Stevenson* v. *Commonwealth*, 218 Va. 462, 237 S. E. 2d 779.

Stevenson was retried in the same court. This second trial ended in a mistrial on May 30, 1978, when a juror asked to be excused after trial had begun and no alternate was available.[1]

A third trial, which began in the same court on June 6, 1978, also ended in a mistrial. It appears that the mistrial may have been declared because a prospective juror had read about Stevenson's previous trials in a newspaper and had told other prospective jurors about the case before the retrial began. See App. 35a–36a.

Stevenson was tried in the same court for a fourth time beginning on September 11, 1978. Present in the courtroom when the case was called were appellants Wheeler and McCarthy, reporters for appellant Richmond Newspapers, Inc. Before the trial began, counsel for the defendant moved that it be closed to the public:

> "[T]here was this woman that was with the family of the deceased when we were here before. She had sat in the Courtroom. I would like to ask that everybody be excluded from the Courtroom because I don't want any information being shuffled back and forth when we have

---

[1] A newspaper account published the next day reported the mistrial and went on to note that "[a] key piece of evidence in Stevenson's original conviction was a bloodstained shirt obtained from Stevenson's wife soon after the killing. The Virginia Supreme Court, however, ruled that the shirt was entered into evidence improperly." App. 34a.

a recess as to what—who testified to what." Tr. of Sept. 11, 1978 Hearing on Defendant's Motion to Close Trial to the Public 2–3.

The trial judge, who had presided over two of the three previous trials, asked if the prosecution had any objection to clearing the courtroom. The prosecutor stated he had no objection and would leave it to the discretion of the court. *Id.*, at 4. Presumably referring to Va. Code § 19.2–266 (Supp. 1980), the trial judge then announced: "[T]he statute gives me that power specifically and the defendant has made the motion." He then ordered "that the Courtroom be kept clear of all parties except the witnesses when they testify." Tr., *supra*, at 4–5.[2] The record does not show that any objections to the closure order were made by anyone present at the time, including appellants Wheeler and McCarthy.

Later that same day, however, appellants sought a hearing on a motion to vacate the closure order. The trial judge granted the request and scheduled a hearing to follow the close of the day's proceedings. When the hearing began, the court ruled that the hearing was to be treated as part of the trial; accordingly, he again ordered the reporters to leave the courtroom, and they complied.

At the closed hearing, counsel for appellants observed that no evidentiary findings had been made by the court prior to the entry of its closure order and pointed out that the court had failed to consider any other, less drastic measures within its power to ensure a fair trial. Tr. of Sept. 11, 1978 Hearing on Motion to Vacate 11–12. Counsel for appellants argued that constitutional considerations mandated that before ordering closure, the court should first decide that the rights of the defendant could be protected in no other way.

---

[2] Virginia Code § 19.2–266 (Supp. 1980) provides in part:

"In the trial of all criminal cases, whether the same be felony or misdemeanor cases, the court may, in its discretion, exclude from the trial any persons whose presence would impair the conduct of a fair trial, provided that the right of the accused to a public trial shall not be violated."

Counsel for defendant Stevenson pointed out that this was the fourth time he was standing trial. He also referred to "difficulty with information between the jurors," and stated that he "didn't want information to leak out," be published by the media, perhaps inaccurately, and then be seen by the jurors. Defense counsel argued that these things, plus the fact that "this is a small community," made this a proper case for closure. *Id.*, at 16–18.

The trial judge noted that counsel for the defendant had made similar statements at the morning hearing. The court also stated:

> "[O]ne of the other points that we take into consideration in this particular Courtroom is layout of the Courtroom. I think that having people in the Courtroom is distracting to the jury. Now, we have to have certain people in here and maybe that's not a very good reason. When we get into our new Court Building, people can sit in the audience so the jury can't see them. The rule of the Court may be different under those circumstances. . . ." *Id.*, at 19.

The prosecutor again declined comment, and the court summed up by saying:

> "I'm inclined to agree with [defense counsel] that, if I feel that the rights of the defendant are infringed in any way, [when] he makes the motion to do something and it doesn't completely override all rights of everyone else, then I'm inclined to go along with the defendant's motion." *Id.*, at 20.

The court denied the motion to vacate and ordered the trial to continue the following morning "with the press and public excluded." *Id.*, at 27; App. 21a.

What transpired when the closed trial resumed the next day was disclosed in the following manner by an order of the court entered September 12, 1978:

> "[I]n the absence of the jury, the defendant by counsel

made a Motion that a mis-trial be declared, which motion was taken under advisement.

"At the conclusion of the Commonwealth's evidence, the attorney for the defendant moved the Court to strike the Commonwealth's evidence on grounds stated to the record, which Motion was sustained by the Court.

"And the jury having been excused, the Court doth find the accused NOT GUILTY of Murder, as charged in the Indictment, and he was allowed to depart." *Id.*, at 22a.[3]

On September 27, 1978, the trial court granted appellants' motion to intervene *nunc pro tunc* in the Stevenson case. Appellants then petitioned the Virginia Supreme Court for writs of mandamus and prohibition and filed an appeal from the trial court's closure order. On July 9, 1979, the Virginia Supreme Court dismissed the mandamus and prohibition petitions and, finding no reversible error, denied the petition for appeal. *Id.*, at 23a–28a.

Appellants then sought review in this Court, invoking both our appellate, 28 U. S. C. § 1257 (2), and certiorari jurisdiction. § 1257 (3). We postponed further consideration of the question of our jurisdiction to the hearing of the case on the merits. 444 U. S. 896 (1979). We conclude that jurisdiction by appeal does not lie;[4] however, treating the filed

---

[3] At oral argument, it was represented to the Court that tapes of the trial were available to the public as soon as the trial terminated. Tr. of Oral Arg. 36.

[4] In our view, the validity of Va. Code § 19.2–266 (Supp. 1980) was not sufficiently drawn in question by appellants before the Virginia courts to invoke our appellate jurisdiction. "It is essential to our jurisdiction on appeal . . . that there be an explicit and timely insistence in the state courts that a state statute, as applied, is repugnant to the federal Constitution, treaties or laws." *Charleston Federal Savings & Loan Assn.* v. *Alderson,* 324 U. S. 182, 185 (1945). Appellants never explicitly challenged the statute's validity. In both the trial court and the State Supreme Court, appellants argued that constitutional rights of the public and the press prevented the court from closing a trial without first

papers as a petition for a writ of certiorari pursuant to 28 U. S. C. § 2103, we grant the petition.

The criminal trial which appellants sought to attend has long since ended, and there is thus some suggestion that the case is moot. This Court has frequently recognized, however, that its jurisdiction is not necessarily defeated by the practical termination of a contest which is short-lived by nature. See, *e. g., Gannett Co.* v. *DePasquale,* 443 U. S. 368, 377–378 (1979); *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539, 546–547 (1976). If the underlying dispute is "capable of repetition, yet evading review," *Southern Pacific Terminal Co.* v. *ICC,* 219 U. S. 498, 515 (1911), it is not moot.

Since the Virginia Supreme Court declined plenary review, it is reasonably foreseeable that other trials may be closed by other judges without any more showing of need than is presented on this record. More often than not, criminal trials will be of sufficiently short duration that a closure order "will evade review, or at least considered plenary review in this Court." *Nebraska Press, supra,* at 547. Accordingly, we turn to the merits.

## II

We begin consideration of this case by noting that the precise issue presented here has not previously been before this

---

giving notice and an opportunity for a hearing to the public and the press and exhausting every alternative means of protecting the defendant's right to a fair trial. Given appellants' failure explicitly to challenge the statute, we view these arguments as constituting claims of rights under the Constitution, which rights are said to limit the exercise of the discretion conferred by the statute on the trial court. Cf. *Phillips* v. *United States,* 312 U. S. 246, 252 (1941) ("[A]n attack on lawless exercise of authority in a particular case is not an attack upon the constitutionality of a statute conferring the authority . . ."). Such claims are properly brought before this Court by way of our certiorari, rather than appellate, jurisdiction. See, *e. g., Kulko* v. *California Superior Court,* 436 U. S. 84, 90, n. 4 (1978); *Hanson* v. *Denckla,* 357 U. S. 235, 244, and n. 4 (1958). We shall, however, continue to refer to the parties as appellants and appellee. See *Kulko, supra.*

Court for decision. In *Gannett Co.* v. *DePasquale, supra,* the Court was not required to decide whether a right of access to *trials,* as distingushed from hearings on *pretrial* motions, was constitutionally guaranteed. The Court held that the Sixth Amendment's guarantee to the accused of a public trial gave neither the public nor the press an enforceable right of access to a *pretrial* suppression hearing. One concurring opinion specifically emphasized that "a hearing on a motion before trial to suppress evidence is not a *trial. . . .*" 443 U. S., at 394 (BURGER, C. J., concurring). Moreover, the Court did not decide whether the First and Fourteenth Amendments guarantee a right of the public to attend trials, *id.,* at 392, and n. 24; nor did the dissenting opinion reach this issue. *Id.,* at 447 (opinion of BLACKMUN, J.).

In prior cases the Court has treated questions involving conflicts between publicity and a defendant's right to a fair trial; as we observed in *Nebraska Press Assn.* v. *Stuart, supra,* at 547, "[t]he problems presented by this [conflict] are almost as old as the Republic." See also, *e. g., Gannett, supra; Murphy* v. *Florida,* 421 U. S. 794 (1975); *Sheppard* v. *Maxwell,* 384 U. S. 333 (1966); *Estes* v. *Texas,* 381 U. S. 532 (1965). But here for the first time the Court is asked to decide whether a criminal trial itself may be closed to the public upon the unopposed request of a defendant, without any demonstration that closure is required to protect the defendant's superior right to a fair trial, or that some other overriding consideration requires closure.

## A

The origins of the proceeding which has become the modern criminal trial in Anglo-American justice can be traced back beyond reliable historical records. We need not here review all details of its development, but a summary of that history is instructive. What is significant for present purposes is that throughout its evolution, the trial has been open to all who cared to observe.

In the days before the Norman Conquest, cases in England were generally brought before moots, such as the local court of the hundred or the county court, which were attended by the freemen of the community. Pollock, English Law Before the Norman Conquest, in 1 Select Essays in Anglo-American Legal History 88, 89 (1907). Somewhat like modern jury duty, attendance at these early meetings was compulsory on the part of the freemen, who were called upon to render judgment. *Id.*, at 89–90; see also 1 W. Holdsworth, A History of English Law 10, 12 (1927).[5]

With the gradual evolution of the jury system in the years after the Norman Conquest, see, *e. g., id.*, at 316, the duty of all freemen to attend trials to render judgment was relaxed, but there is no indication that criminal trials did not remain public. When certain groups were excused from compelled attendance, see the Statute of Marlborough, 52 Hen. 3, ch. 10 (1267); 1 Holdsworth, *supra,* at 79, and n. 4, the statutory exemption did not prevent them from attending; Lord Coke observed that those excused "are not compellable to come, but left to their own liberty." 2 E. Coke, Institutes of the Laws of England 121 (6th ed. 1681).[6]

Although there appear to be few contemporary statements

---

[5] That there is little in the way of a contemporary record from this period is not surprising. It has been noted by historians, see E. Jenks, A Short History of English Law 3–4 (2d ed. 1922), that the early Anglo-Saxon laws "deal rather with the novel and uncertain, than with the normal and undoubted rules of law. . . . Why trouble to record that which every village elder knows? Only when a disputed point has long caused bloodshed and disturbance, or when a successful invader . . . insists on a change, is it necessary to draw up a code." *Ibid.*

[6] Coke interpreted certain language of an earlier chapter of the same statute as specifically indicating that court proceedings were to be public in nature: "These words [*In curia Domini Regis*] are of great importance, for all Causes ought to be heard, ordered, and determined before the Judges of the King's Courts *openly* in the King's Courts, *whither all persons may resort.* . . ." 2 E. Coke, Institutes of the Laws of England 103 (6th ed. 1681) (emphasis added).

on the subject, reports of the Eyre of Kent, a general court held in 1313–1314, evince a recognition of the importance of public attendance apart from the "jury duty" aspect. It was explained that

> "the King's will was that all evil doers should be punished after their deserts, and that justice should be ministered indifferently to rich as to poor; *and for the better accomplishing of this,* he prayed the community of the county *by their attendance* there to lend him their aid in the establishing of a happy and certain peace that should be both for the honour of the realm and for their own welfare." 1 Holdsworth, *supra,* at 268, quoting from the S. S. edition of the Eyre of Kent, vol. i., p. 2 (emphasis added).

From these early times, although great changes in courts and procedure took place, one thing remained constant: the public character of the trial at which guilt or innocence was decided. Sir Thomas Smith, writing in 1565 about "the definitive proceedinges in causes criminall," explained that, while the indictment was put in writing as in civil law countries:

> "All the rest is doone openlie in the presence of the Judges, the Justices, the enquest, the prisoner, *and so manie as will or can come so neare as to heare it,* and all depositions and witnesses given aloude, *that all men may heare from the mouth of the depositors and witnesses what is saide."* T. Smith, De Republica Anglorum 101 (Alston ed. 1972) (emphasis added).

Three centuries later, Sir Frederick Pollock was able to state of the "rule of publicity" that, "[h]ere we have one tradition, at any rate, which has persisted through all changes." F. Pollock, The Expansion of the Common Law 31–32 (1904). See also E. Jenks, The Book of English Law 73–74 (6th ed. 1967): "[O]ne of the most conspicuous features of English justice, that all judicial trials are held in open court, to which the

public have free access, . . . appears to have been the rule in England from time immemorial."

We have found nothing to suggest that the presumptive openness of the trial. which English courts were later to call "one of the essential qualities of a court of justice," *Daubney* v. *Cooper,* 10 B. & C. 237, 240, 109 Eng. Rep. 438, 440 (K. B. 1829), was not also an attribute of the judicial systems of colonial America. In Virginia, for example, such records as there are of early criminal trials indicate that they were open, and nothing to the contrary has been cited. See A. Scott, Criminal Law in Colonial Virginia 128–129 (1930); Reinsch, The English Common Law in the Early American Colonies, in 1 Select Essays in Anglo-American Legal History 367, 405 (1907). Indeed, when in the mid-1600's the Virginia Assembly felt that the respect due the courts was "by the clamorous unmannerlynes of the people lost, and order, gravity and decoram which should manifest the authority of a court in the court it selfe neglected," the response was not to restrict the openness of the trials to the public, but instead to prescribe rules for the conduct of those attending them. See Scott, *supra,* at 132.

In some instances, the openness of trials was explicitly recognized as part of the fundamental law of the Colony. The 1677 Concessions and Agreements of West New Jersey, for example, provided:

> "That in all publick courts of justice for tryals .of causes, civil or criminal, any person or persons, inhabitants of the said Province may freely come into, and attend the said courts, and hear and be present, at all or any such tryals as shall be there had or passed, that justice may not be done in a corner nor in any covert manner." Reprinted in Sources of Our Liberties 188 (R. Perry ed. 1959).

See also 1 B. Schwartz, The Bill of Rights: A Documentary History 129 (1971).

The Pennsylvania Frame of Government of 1682 also provided "[t]hat all courts shall be open . . . ," Sources of Our Liberties, *supra,* at 217; 1 Schwartz, *supra,* at 140, and this declaration was reaffirmed in § 26 of the Constitution adopted by Pennsylvania in 1776. See 1 Schwartz, *supra,* at 271. See also §§ 12 and 76 of the Massachusetts Body of Liberties, 1641, reprinted in 1 Schwartz, *supra,* at 73, 80.

Other contemporary writings confirm the recognition that part of the very nature of a criminal trial was its openness to those who wished to attend. Perhaps the best indication of this is found in an address to the inhabitants of Quebec which was drafted by a committee consisting of Thomas Cushing, Richard Henry Lee, and John Dickinson and approved by the First Continental Congress on October 26, 1774. 1 Journals of the Continental Congress, 1774–1789, pp. 101, 105 (1904) (Journals). This address, written to explain the position of the Colonies and to gain the support of the people of Quebec, is an "exposition of the fundamental rights of the colonists, as they were understood by a representative assembly chosen from all the colonies." 1 Schwartz, *supra,* at 221. Because it was intended for the inhabitants of Quebec, who had been "educated under another form of government" and had only recently become English subjects, it was thought desirable for the Continental Congress to explain "the inestimable advantages of a free English constitution of government, which it is the privilege of all English subjects to enjoy." 1 Journals 106.

> "[One] great right is that of trial by jury. This provides, that neither life, liberty nor property, can be taken from the possessor, until twelve of his unexceptionable countrymen and peers of his vicinage, who from that neighbourhood may reasonably be supposed to be acquainted with his character, and the characters of the witnesses, upon a fair trial, and full enquiry, face to face, *in open Court, before as many of the people as chuse to*

*attend*, shall pass their sentence upon oath against him. . . ." *Id.*, at 107 (emphasis added).

## B

As we have shown, and as was shown in both the Court's opinion and the dissent in *Gannett*, 443 U. S., at 384, 386, n. 15, 418–425, the historical evidence demonstrates conclusively that at the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open. This is no quirk of history; rather, it has long been recognized as an indispensable attribute of an Anglo-American trial. Both Hale in the 17th century and Blackstone in the 18th saw the importance of openness to the proper functioning of a trial; it gave assurance that the proceedings were conducted fairly to all concerned, and it discouraged perjury, the misconduct of participants, and decisions based on secret bias or partiality. See, *e. g.*, M. Hale, The History of the Common Law of England 343–345 (6th ed. 1820); 3 W. Blackstone, Commentaries *372–*373. Jeremy Bentham not only recognized the therapeutic value of open justice but regarded it as the keystone:

> "Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account. Recordation, appeal, whatever other institutions might present themselves in the character of checks, would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance." 1 J. Bentham, Rationale of Judicial Evidence 524 (1827).[7]

Panegyrics on the values of openness were by no means confined to self-praise by the English. Foreign observers of English criminal procedure in the 18th and early 19th cen-

---

[7] Bentham also emphasized that open proceedings enhanced the performance of all involved, protected the judge from imputations of dishonesty, and served to educate the public. Rationale of Judicial Evidence, at 522–525.

turies came away impressed by the very fact that they had been freely admitted to the courts, as many were not in their own homelands. See L. Radzinowicz, A History of English Criminal Law 715, and n. 96 (1948). They marveled that "the whole juridical procedure passes in public," 2 P. Grosley, A Tour to London; or New Observations on England 142 (Nugent trans. 1772), quoted in Radzinowicz, *supra,* at 717, and one commentator declared:

> "The main excellence of the English judicature consists in publicity, in the free trial by jury, and in the extraordinary despatch with which business is transacted. The publicity of their proceedings is indeed astonishing. *Free access to the courts is universally granted.*" C. Goede, A Foreigner's Opinion of England 214 (Horne trans. 1822). (Emphasis added.)

The nexus between openness, fairness, and the perception of fairness was not lost on them:

> "[T]he judge, the counsel, and the jury, are constantly exposed to public animadversion; and this greatly tends to augment the extraordinary confidence, which the English repose in the administration of justice." *Id.,* at 215.

This observation raises the important point that "[t]he publicity of a judicial proceeding is a requirement of much broader bearing than its mere effect upon the quality of testimony." 6 J. Wigmore, Evidence § 1834, p. 435 (J. Chadbourn rev 1976).[8] The early history of open trials in part reflects the widespread acknowledgment, long before there were behavioral scientists, that public trials had significant community therapeutic value. Even without such experts to frame

---

[8] A collateral aspect seen by Wigmore was the possibility that someone in attendance at the trial or who learns of the proceedings through publicity may be able to furnish evidence in chief or contradict "falsifiers." 6 Wigmore, at 436. Wigmore gives examples of such occurrences. *Id.,* at 436, and n. 2.

the concept in words, people sensed from experience and observation that, especially in the administration of criminal justice, the means used to achieve justice must have the support derived from public acceptance of both the process and its results.

When a shocking crime occurs, a community reaction of outrage and public protest often follows. See H. Weihofen, The Urge to Punish 130–131 (1956). Thereafter the open processes of justice serve an important prophylactic purpose, providing an outlet for community concern, hostility, and emotion. Without an awareness that society's responses to criminal conduct are underway, natural human reactions of outrage and protest are frustrated and may manifest themselves in some form of vengeful ".self-help," as indeed they did regularly in the activities of vigilante "committees" on our frontiers. "The accusation and conviction or acquittal, as much perhaps as the execution of punishment, operat[e] to restore the imbalance which was created by the offense or public charge, to reaffirm the temporarily lost feeling of security and, perhaps, to satisfy that latent 'urge to punish.' " Mueller, Problems Posed by Publicity to Crime and Criminal Proceedings, 110 U. Pa. L. Rev. 1, 6 (1961).

Civilized societies withdraw both from the victim and the vigilante the enforcement of criminal laws, but they cannot erase from people's consciousness the fundamental, natural yearning to see justice done—or even the urge for retribution. The crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if justice is "done in a corner [or] in any covert manner." *Supra,* at 567. It is not enough to say that results alone will satiate the natural community desire for "satisfaction." A result considered untoward may undermine public confidence, and where the trial has been concealed from public view an unexpected outcome can cause a reaction that the system at best has failed and at worst has been corrupted. To work effectively, it is important that society's criminal

process "satisfy the appearance of justice." *Offutt* v. *United States,* 348 U. S. 11, 14 (1954), and the appearance of justice can best be provided by allowing people to observe it.

Looking back, we see that when the ancient "town meeting" form of trial became too cumbersome, 12 members of the community were delegated to act as its surrogates, but the community did not surrender its right to observe the conduct of trials. The people retained a "right of visitation" which enabled them to satisfy themselves that justice was in fact being done.

People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing. When a criminal trial is conducted in the open, there is at least an opportunity both for understanding the system in general and its workings in a particular case:

> "The educative effect of public attendance is a material advantage. Not only is respect for the law increased and intelligent acquaintance acquired with the methods of government, but a strong confidence in judicial remedies is secured which could never be inspired by a system of secrecy." 6 Wigmore, *supra,* at 438. See also 1 J. Bentham, Rationale of Judicial Evidence, at 525.

In earlier times, both in England and America, attendance at court was a common mode of "passing the time." See, e. g., 6 Wigmore, *supra,* at 436; Mueller, *supra,* at 6. With the press, cinema, and electronic media now supplying the representations or reality of the real life drama once available only in the courtroom, attendance at court is no longer a widespread pastime. Yet "[i]t is not unrealistic even in this day to believe that public inclusion affords citizens a form of legal education and hopefully promotes confidence in the fair administration of justice." *State* v. *Schmit,* 273 Minn. 78, 87–88, 139 N. W. 2d 800, 807 (1966). Instead of acquiring information about trials by firsthand observation or by word

of mouth from those who attended, people now acquire it chiefly through the print and electronic media. In a sense, this validates the media claim of functioning as surrogates for the public. While media representatives enjoy the same right of access as the public, they often are provided special seating and priority of entry so that they may report what people in attendance have seen and heard. This "contribute[s] to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system. . . ." *Nebraska Press Assn. v. Stuart*, 427 U. S., at 587 (BRENNAN, J., concurring in judgment).

## C

From this unbroken, uncontradicted history, supported by reasons as valid today as in centuries past, we are bound to conclude that a presumption of openness inheres in the very nature of a criminal trial under our system of justice. This conclusion is hardly novel; without a direct holding on the issue, the Court has voiced its recognition of it in a variety of contexts over the years.[9] Even while holding, in *Levine* v.

---

[9] "Of course trials must be public and the public have a deep interest in trials." *Pennekamp* v. *Florida*, 328 U. S. 331, 361 (1946) (Frankfurter, J, concurring).

"A trial is a public event. What transpires in the court room is public property." *Craig* v. *Harney*, 331 U. S. 367, 374 (1947) (Douglas, J.).

"[W]e have been unable to find a single instance of a criminal trial conducted in camera in any federal, state, or municipal court during the history of this country. Nor have we found any record of even one such secret criminal trial in England since abolition of the Court of Star Chamber in 1641, and whether that court ever convicted people secretly is in dispute. . . .

"This nation's accepted practice of guaranteeing a public trial to an accused has its roots in our English common law heritage. The exact date of its origin is obscure, but it likely evolved long before the settlement of our land as an accompaniment of the ancient institution of jury trial." *In re Oliver*, 333 U. S. 257, 266 (1948) (Black, J.) (footnotes omitted).

"One of the demands of a democratic society is that the public should know what goes on in courts by being told by the press what happens

*United States,* 362 U. S. 610 (1960). that a criminal contempt proceeding was not a "criminal prosecution" within the meaning of the Sixth Amendment, the Court was careful to note that more than the Sixth Amendment was involved:

> "[W]hile the right to a 'public trial' is explicitly guaranteed by the Sixth Amendment only for 'criminal prosecutions,' that provision is a reflection of the notion, deeply rooted in the common law, that 'justice must satisfy the appearance of justice.' . . . [D]ue process demands appropriate regard for the requirements of a public proceeding in cases of criminal contempt . . . as it does for all adjudications through the exercise of the judicial power, barring narrowly limited categories of exceptions. . . ." *Id.,* at 616.[10]

And recently in *Gannett Co.* v. *DePasquale,* 443 U. S. 368 (1979), both the majority, *id.,* at 384, 386, n. 15, and dissenting opinion, *id.,* at 423, agreed that open trials were part of the common-law tradition.

---

there, to the end that the public may judge whether our system of criminal justice is fair and right." *Maryland* v. *Baltimore Radio Show, Inc.,* 338 U. S. 912, 920 (1950) (Frankfurter, J., dissenting from denial of certiorari).

"It is true that the public has the right to be informed as to what occurs in its courts, . . . reporters of all media, including television, are always present if they wish to be and are plainly free to report whatever occurs in open court. . . ." *Estes* v. *Texas,* 381 U. S. 532, 541–542 (1965) (Clark, J.); see also *id.,* at 583–584 (Warren, C. J., concurring). (The Court ruled, however, that the televising of the criminal trial over the defendant's objections violated his due process right to a fair trial.)

"The principle that justice cannot survive behind walls of silence has long been reflected in the 'Anglo-American distrust for secret trials.' " *Sheppard* v. *Maxwell,* 384 U. S. 333, 349 (1966) (Clark, J.).

[10] The Court went on to hold that, "on the particular circumstances of the case," 362 U. S., at 616, the accused could not complain on appeal of the "so-called 'secrecy' of the proceedings," *id.,* at 617, because, with counsel present, he had failed to object or to request the judge to open the courtroom at the time.

Despite the history of criminal trials being presumptively open since long before the Constitution, the State presses its contention that neither the Constitution nor the Bill of Rights contains any provision which by its terms guarantees to the public the right to attend criminal trials. Standing alone, this is correct, but there remains the question whether, absent an explicit provision, the Constitution affords protection against exclusion of the public from criminal trials.

### III

### A

The First Amendment, in conjunction with the Fourteenth, prohibits governments from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." These expressly guaranteed freedoms share a common core purpose of assuring freedom of communication on matters relating to the functioning of government. Plainly it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted; as we have shown, recognition of this pervades the centuries-old history of open trials and the opinions of this Court. *Supra,* at 564–575, and n. 9.

The Bill of Rights was enacted against the backdrop of the long history of trials being presumptively open. Public access to trials was then regarded as an important aspect of the process itself; the conduct of trials "before as many of the people as chuse to attend" was regarded as one of "the inestimable advantages of a free English constitution of government." 1 Journals 106, 107. In guaranteeing freedoms such as those of speech and press, the First Amendment can be read as protecting the right of everyone to attend trials so as to give meaning to those explicit guarantees. "[T]he First Amendment goes beyond protection of the press and the self-

expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765, 783 (1978). Free speech carries with it some freedom to listen. "In a variety of contexts this Court has referred to a First Amendment right to 'receive information and ideas.' " *Kleindienst* v. *Mandel,* 408 U. S. 753, 762 (1972). What this means in the context of trials is that the First Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing courtroom doors which had long been open to the public at the time that Amendment was adopted. "For the First Amendment does not speak equivocally. . . . It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow." *Bridges* v. *California,* 314 U. S. 252, 263 (1941) (footnote omitted).

It is not crucial whether we describe this right to attend criminal trials to hear, see, and communicate observations concerning them as a "right of access," cf. *Gannett, supra,* at 397 (POWELL, J., concurring); *Saxbe* v. *Washington Post Co.,* 417 U. S. 843 (1974); *Pell* v. *Procunier,* 417 U. S. 817 (1974),[11] or a "right to gather information," for we have recognized that "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg* v. *Hayes,* 408 U. S. 665, 681 (1972). The explicit, guaranteed rights to speak and to publish concerning what takes place at a

---

[11] *Procunier* and *Saxbe* are distinguishable in the sense that they were concerned with penal institutions which, by definition, are not "open" or public places. Penal institutions do not share the long tradition of openness, although traditionally there have been visiting committees of citizens, and there is no doubt that legislative committees could exercise plenary oversight and "visitation rights." *Saxbe,* 417 U. S., at 849, noted that "limitation on visitations is justified by what the Court of Appeals acknowledged as 'the truism that prisons are institutions where public access is generally limited.' 161 U. S. App. D. C., at 80, 494 F. 2d, at 999. See *Adderley* v. *Florida,* 385 U. S. 39, 41 (1966) [jails]." See also *Greer* v. *Spock,* 424 U. S. 828 (1976) (military bases).

trial would lose much meaning if access to observe the trial could, as it was here, be foreclosed arbitrarily.[12]

## B

The right of access to places traditionally open to the public, as criminal trials have long been, may be seen as assured by the amalgam of the First Amendment guarantees of speech and press; and their affinity to the right of assembly is not without relevance. From the outset, the right of assembly was regarded not only as an independent right but also as a catalyst to augment the free exercise of the other First Amendment rights with which it was deliberately linked by the draftsmen.[13]

---

[12] That the right to attend may be exercised by people less frequently today when information as to trials generally reaches them by way of print and electronic media in no way alters the basic right. Instead of relying on personal observation or reports from neighbors as in the past, most people receive information concerning trials through the media whose representatives "are entitled to the same rights [to attend trials] as the general public." *Estes* v. *Texas*, 381 U. S., at 540.

[13] When the First Congress was debating the Bill of Rights, it was contended that there was no need separately to assert the right of assembly because it was subsumed in freedom of speech. Mr. Sedgwick of Massachusetts argued that inclusion of "assembly" among the enumerated rights would tend to make the Congress "appear trifling in the eyes of their constituents. . . . If people freely converse together, they must assemble for that purpose; it is a self-evident, unalienable right which the people possess; it is certainly a thing that never would be called in question. . . ." 1 Annals of Cong. 731 (1789).

Since the right existed independent of any written guarantee, Sedgwick went on to argue that if it were the drafting committee's purpose to protect all inherent rights of the people by listing them, "they might have gone into a very lengthy enumeration of rights," but this was unnecessary, he said, "in a Government where none of them were intended to be infringed." *Id.*, at 732.

Mr. Page of Virginia responded, however, that at times "such rights have been opposed," and that "people have . . . been prevented from assembling together on their lawful occasions":

"[T]herefore it is well to guard against such stretches of authority, by inserting the privilege in the declaration of rights. If the people could

"The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental." *De Jonge* v. *Oregon,* 299 U. S. 353, 364 (1937). People assemble in public places not only to speak or to take action, but also to listen, observe, and learn; indeed, they may "assembl[e] for any lawful purpose," *Hague* v. *CIO,* 307 U. S. 496, 519 (1939) (opinion of Stone, J.). Subject to the traditional time, place, and manner restrictions, see, *e. g., Cox* v. *New Hampshire,* 312 U. S. 569 (1941); see also *Cox* v. *Louisiana,* 379 U. S. 559, 560–564 (1965), streets, sidewalks, and parks are places traditionally open, where First Amendment rights may be exercised, see *Hague* v. *CIO, supra,* at 515 (opinion of Roberts, J.); a trial courtroom also is a public place where the people generally—and representatives of the media—have a right to be present, and where their presence historically has been thought to enhance the integrity and quality of what takes place.[14]

be deprived of the power of assembling under any pretext whatsoever, they might be deprived of every other privilege contained in the clause." *Ibid.* The motion to strike "assembly" was defeated. *Id.,* at 733.

[14] It is of course true that the right of assembly in our Bill of Rights was in large part drafted in reaction to restrictions on such rights in England. See, *e. g.,* 1 Geo. 1, stat. 2, ch. 5 (1714); cf. 36 Geo. 3, ch. 8 (1795). As we have shown, the right of Englishmen to attend trials was not similarly limited; but it would be ironic indeed if the very historic openness of the trial could militate against protection of the right to attend it. The Constitution guarantees more than simply freedom from those abuses which led the Framers to single out particular rights. The very purpose of the First Amendment is to guarantee all facets of each right described; its draftsmen sought both to protect the "rights of Englishmen" and to enlarge their scope. See *Bridges* v. *California,* 314 U. S. 252, 263–265 (1941).

"There are no contrary implications in any part of the history of the period in which the First Amendment was framed and adopted. No purpose in ratifying the Bill of Rights was clearer than that of securing for the people of the United States much greater freedom of religion, expression, assembly, and petition than the people of Great Britain had ever enjoyed." *Id.,* at 265.

## C

The State argues that the Constitution nowhere spells out a guarantee for the right of the public to attend trials, and that accordingly no such right is protected. The possibility that such a contention could be made did not escape the notice of the Constitution's draftsmen; they were concerned that some important rights might be thought disparaged because not specifically guaranteed. It was even argued that because of this danger no Bill of Rights should be adopted. See, *e. g.,* The Federalist No. 84 (A. Hamilton). In a letter to Thomas Jefferson in October 1788, James Madison explained why he, although "in favor of a bill of rights," had "not viewed it in an important light" up to that time: "I conceive that in a certain degree . . . the rights in question are reserved by the manner in which the federal powers are granted." He went on to state that "there is great reason to fear that a positive declaration of some of the most essential rights could not be obtained in the requisite latitude." 5 Writings of James Madison 271 (G. Hunt ed. 1904).[15]

But arguments such as the State makes have not precluded recognition of important rights not enumerated. Notwithstanding the appropriate caution against reading into the Constitution rights not explicitly defined, the Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees. For example, the rights of association and of privacy, the right to be presumed innocent, and the right to be judged by a standard of proof beyond a rea-

---

[15] Madison's comments in Congress also reveal the perceived need for some sort of constitutional "saving clause," which, among other things, would serve to foreclose application to the Bill of Rights of the maxim that the affirmation of particular rights implies a negation of those not expressly defined. See 1 Annals of Cong. 438–440 (1789). See also, *e. g.,* 2 J. Story, Commentaries on the Constitution of the United States 651 (5th ed. 1891). Madison's efforts, culminating in the Ninth Amendment, served to allay the fears of those who were concerned that expressing certain guarantees could be read as excluding others.

sonable doubt in a criminal trial, as well as the right to travel, appear nowhere in the Constitution or Bill of Rights. Yet these important but unarticulated rights have nonetheless been found to share constitutional protection in common with explicit guarantees.[16] The concerns expressed by Madison and others have thus been resolved; fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined.

We hold that the right to attend criminal trials [17] is implicit in the guarantees of the First Amendment; without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and "of the press could be eviscerated." *Branzburg*, 408 U. S., at 681.

## D

Having concluded there was a guaranteed right of the public under the First and Fourteenth Amendments to attend the trial of Stevenson's case, we return to the closure order challenged by appellants. The Court in *Gannett* made clear that although the Sixth Amendment guarantees the accused a right to a public trial, it does not give a right to a private trial. 443 U. S., at 382. Despite the fact that this was the fourth trial of the accused, the trial judge made no findings to support closure; no inquiry was made as to whether alterna-

---

[16] See, *e. g., NAACP* v. *Alabama,* 357 U. S. 449 (1958) (right of association); *Griswold* v. *Connecticut,* 381 U. S. 479 (1965), and *Stanley* v. *Georgia,* 394 U. S. 557 (1969) (right to privacy); *Estelle* v. *Williams,* 425 U. S. 501, 503 (1976), and *Taylor* v. *Kentucky,* 436 U. S. 478, 483–486 (1978) (presumption of innocence); *In re Winship,* 397 U. S. 358 (1970) (standard of proof beyond a reasonable doubt); *United States* v. *Guest,* 383 U. S. 745, 757–759 (1966), and *Shapiro* v. *Thompson,* 394 U. S. 618, 630 (1969) (right to interstate travel).

[17] Whether the public has a right to attend trials of civil cases is a question not raised by this case, but we note that historically both civil and criminal trials have been presumptively open.

tive solutions would have met the need to ensure fairness; there was no recognition of any right under the Constitution for the public or press to attend the trial. In contrast to the pretrial proceeding dealt with in *Gannett*, there exist in the context of the trial itself various tested alternatives to satisfy the constitutional demands of fairness. See, *e. g.*, *Nebraska Press Assn.* v. *Stuart*, 427 U. S., at 563–565; *Sheppard* v. *Maxwell*, 384 U. S., at 357–362. There was no suggestion that any problems with witnesses could not have been dealt with by their exclusion from the courtroom or their sequestration during the trial. See *id.*, at 359. Nor is there anything to indicate that sequestration of the jurors would not have guarded against their being subjected to any improper information. All of the alternatives admittedly present difficulties for trial courts, but none of the factors relied on here was beyond the realm of the manageable. Absent an overriding interest articulated in findings, the trial of a criminal case must be open to the public.[18] Accordingly, the judgment under review is

*Reversed.*

Mr. Justice Powell took no part in the consideration or decision of this case.

Mr. Justice White, concurring.

This case would have been unnecessary had *Gannett Co.* v. *DePasquale*, 443 U. S. 368 (1979), construed the Sixth

---

[18] We have no occasion here to define the circumstances in which all or parts of a criminal trial may be closed to the public, cf., *e. g.*, 6 J. Wigmore, Evidence § 1835 (J. Chadbourn rev. 1976), but our holding today does not mean that the First Amendment rights of the public and representatives of the press are absolute. Just as a government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic, see, *e. g.*, *Cox* v. *New Hampshire*, 312 U. S. 569 (1941), so may a trial judge, in the interest of the fair administration of justice, impose reasonable limitations on access to a trial. "[T]he question in a particular case is whether that control is

Amendment to forbid excluding the public from criminal proceedings except in narrowly defined circumstances. But the Court there rejected the submission of four of us to this effect. thus requiring that the First Amendment issue involved here be addressed. On this issue, I concur in the opinion of THE CHIEF JUSTICE.

MR. JUSTICE STEVENS, concurring.

This is a watershed case. Until today the Court has accorded virtually absolute protection to the dissemination of information or ideas, but never before has it squarely held that the acquisition of newsworthy matter is entitled to any constitutional protection whatsoever. An additional word of emphasis is therefore appropriate.

Twice before, the Court has implied that any governmental restriction on access to information, no matter how severe and no matter how unjustified, would be constitutionally acceptable so long as it did not single out the press for special disabilities not applicable to the public at large. In a dissent joined by MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL in *Saxbe* v. *Washington Post Co.,* 417 U. S. 843, 850, MR. JUSTICE POWELL unequivocally rejected the conclusion that *"any* governmental restriction on press access to information,

exerted so as not to deny or unwarrantedly abridge . . . the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." *Id.,* at 574. It is far more important that trials be conducted in a quiet and orderly setting than it is to preserve that atmosphere on city streets. Compare, *e. g., Kovacs* v. *Cooper,* 336 U. S. 77 (1949), with *Illinois* v. *Allen,* 397 U. S. 337 (1970), and *Estes* v. *Texas,* 381 U. S. 532 (1965). Moreover, since courtrooms have limited capacity, there may be occasions when not every person who wishes to attend can be accommodated. In such situations, reasonable restrictions on general access are traditionally imposed, including preferential seating for media representatives. Cf. *Gannett,* 443 U. S., at 397–398 (POWELL, J., concurring); *Houchins* v. *KQED, Inc.,* 438 U. S. 1, 17 (1978) (STEWART, J., concurring in judgment); *id.,* at 32 (STEVENS, J., dissenting).

so long as it is nondiscriminatory, falls outside the purview of First Amendment concern." *Id.*, at 857 (emphasis in original). And in *Houchins* v. *KQED, Inc.*, 438 U. S. 1, 19–40, I explained at length why MR. JUSTICE BRENNAN, MR. JUSTICE POWELL, and I were convinced that "[a]n official prison policy of concealing . . . knowledge from the public by arbitrarily cutting off the flow of information at its source abridges the freedom of speech and of the press protected by the First and Fourteenth Amendments to the Constitution." *Id.*, at 38. Since MR. JUSTICE MARSHALL and MR. JUSTICE BLACKMUN were unable to participate in that case, a majority of the Court neither accepted nor rejected that conclusion or the contrary conclusion expressed in the prevailing opinions.[1] Today, however, for the first time, the Court unequivocally holds that an arbitrary interference with access to important information is an abridgment of the freedoms of speech and of the press protected by the First Amendment.

It is somewhat ironic that the Court should find more reason to recognize a right of access today than it did in *Houchins*. For *Houchins* involved the plight of a segment of society least able to protect itself, an attack on a long-standing policy of concealment, and an absence of any legitimate justification for abridging public access to information about how government operates. In this case we are protecting the interests of the most powerful voices in the community, we are concerned with an almost unique exception to an established tradition of openness in the conduct of crim-

---

[1] "Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." 438 U. S., at 15 (opinion of BURGER, C. J.).

"The First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by government. . . . The Constitution does no more than assure the public and the press equal access once government has opened its doors." *Id.*, at 16 (STEWART, J., concurring in judgment).

inal trials, and it is likely that the closure order was motivated by the judge's desire to protect the individual defendant from the burden of a fourth criminal trial.[2]

In any event, for the reasons stated in Part II of my *Houchins* opinion, 438 U. S., at 30–38, as well as those stated by THE CHIEF JUSTICE today, I agree that the First Amendment protects the public and the press from abridgment of their rights of access to information about the operation of their government, including the Judicial Branch; given the total absence of any record justification for the closure order entered in this case, that order violated the First Amendment.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, concurring in the judgment.

*Gannett Co.* v. *DePasquale,* 443 U. S. 368 (1979), held that the Sixth Amendment right to a public trial was personal to the accused, conferring no right of access to pretrial proceedings that is separately enforceable by the public or the press. The instant case raises the question whether the First Amendment, of its own force and as applied to the States through

---

[2] Neither that likely motivation nor facts showing the risk that a fifth trial would have been necessary without closure of the fourth are disclosed in this record, however. The absence of any articulated reason for the closure order is a sufficient basis for distinguishing this case from *Gannett Co.* v. *DePasquale,* 443 U. S. 368. The decision today is in no way inconsistent with the perfectly unambiguous holding in *Gannett* that the rights guaranteed by the Sixth Amendment are rights that may be asserted by the accused rather than members of the general public. In my opinion the Framers quite properly identified the party who has the greatest interest in the right to a public trial. The language of the Sixth Amendment is worth emphasizing:

"In all criminal prosecutions, *the accused* shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." (Emphasis added.)

the Fourteenth Amendment, secures the public an independent right of access to trial proceedings. Because I believe that the First Amendment—of itself and as applied to the States through the Fourteenth Amendment—secures such a public right of access, I agree with those of my Brethren who hold that, without more, agreement of the trial judge and the parties cannot constitutionally close a trial to the public.[1]

# I

While freedom of expression is made inviolate by the First Amendment, and, with only rare and stringent exceptions, may not be suppressed, see, *e. g., Brown* v. *Glines,* 444 U. S. 348, 364 (1980) (BRENNAN, J., dissenting); *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539, 558–559 (1976); *id.,* at 590 (BRENNAN, J., concurring in judgment); *New York Times Co.* v. *United States,* 403 U. S. 713, 714 (1971) (*per curiam* opinion); *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 715–716 (1931), the First Amendment has not been viewed by the Court in all settings as providing an equally categorical assurance of the correlative freedom of access to information, see, *e. g., Saxbe* v. *Washington Post Co.,* 417 U. S. 843, 849

---

[1] Of course, the Sixth Amendment remains the source of the *accused's* own right to insist upon public judicial proceedings. *Gannett Co.* v. *DePasquale,* 443 U. S. 368 (1979).

That the Sixth Amendment explicitly establishes a public trial right does not impliedly foreclose the derivation of such a right from other provisions of the Constitution. The Constitution was not framed as a work of carpentry, in which all joints must fit snugly without overlapping. Of necessity, a document that designs a form of government will address central political concerns from a variety of perspectives. Significantly, this Court has recognized the open trial right both as a matter of the Sixth Amendment and as an ingredient in Fifth Amendment due process. See *Levine* v. *United States,* 362 U. S. 610, 614, 616 (1960); cf. *In re Oliver,* 333 U. S. 257 (1948) (Fourteenth Amendment due process). Analogously, racial segregation has been found independently offensive to the Equal Protection and Fifth Amendment Due Process Clauses. Compare *Brown* v. *Board of Education,* 347 U. S. 483, 495 (1954), with *Bolling* v. *Sharpe,* 347 U. S. 497, 499–500 (1954).

(1974); *Zemel* v. *Rusk,* 381 U. S. 1, 16–17 (1965); see also *Houchins* v. *KQED, Inc.,* 438 U. S. 1, 8–9 (1978) (opinion of BURGER, C. J.); *id.,* at 16 (STEWART, J., concurring in judgment); *Gannett Co.* v. *DePasquale,* 433 U. S., at 404–405 (REHNQUIST, J., concurring). But cf. *id.,* at 397–398 (POW-ELL, J., concurring); *Houchins, supra,* at 27–38 (STEVENS, J., dissenting); *Saxbe, supra,* at 856–864 (POWELL, J., dissenting); *Pell* v. *Procunier,* 417 U. S. 817, 839–842 (1974) (Douglas, J., dissenting).[2] Yet the Court has not ruled out a public access component to the First Amendment in every circumstance. Read with care and in context, our decisions must therefore be understood as holding only that any privilege of access to governmental information is subject to a degree of restraint dictated by the nature of the information and countervailing interests in security or confidentiality. See *Houchins, supra,* at 8–9 (opinion of BURGER, C. J.) (access to prisons); *Saxbe, supra,* at 849 (same); *Pell, supra,* at 831–832 (same); *Estes* v. *Texas,* 381 U. S. 532, 541–542 (1965) (television in courtroom); *Zemel* v. *Rusk, supra,* at 16–17 (validation of passport to unfriendly country). These cases neither comprehensively nor absolutely deny that public access to information may at times be implied by the First Amendment and the principles which animate it.

The Court's approach in right-of-access cases simply reflects the special nature of a claim of First Amendment right to gather information. Customarily, First Amendment guarantees are interposed to protect communication between speaker

---

[2] A conceptually separate, yet related, question is whether the media should enjoy greater access rights than the general public. See, *e. g., Saxbe* v. *Washington Post Co.,* 417 U. S., at 850; *Pell* v. *Procunier,* 417 U. S., at 834–835. But no such contention is at stake here. Since the media's right of access is at least equal to that of the general public, see *ibid.,* this case is resolved by a decision that the state statute unconstitutionally restricts public access to trials. As a practical matter, however, the institutional press is the likely, and fitting, chief beneficiary of a right of access because it serves as the "agent" of interested citizens, and funnels information about trials to a large number of individuals.

and listener. When so employed against prior restraints, free speech protections are almost insurmountable. See *Nebraska Press Assn.* v. *Stuart, supra,* at 558–559; *New York Times Co.* v. *United States, supra,* at 714 (*per curiam* opinion). See generally Brennan, Address, 32 Rutgers L. Rev. 173, 176 (1979). But the First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a *structural* role to play in securing and fostering our republican system of self-government. See *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152–153, n. 4 (1938); *Grosjean* v. *American Press Co.,* 297 U. S. 233, 249–250 (1936); *Stromberg* v. *California,* 283 U. S. 359, 369 (1931); Brennan, *supra,* at 176–177; J. Ely, Democracy and Distrust 93–94 (1980); T. Emerson, The System of Freedom of Expression 7 (1970); A. Meiklejohn, Free Speech and Its Relation to Self-Government (1948); Bork, Neutral Principles and Some First Amendment Problems, 47 Ind. L. J. 1, 23 (1971). Implicit in this structural role is not only "the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964), but also the antecedent assumption that valuable public debate—as well as other civic behavior—must be informed.[3] The structural

---

[3] This idea has been foreshadowed in MR. JUSTICE POWELL's dissent in *Saxbe* v. *Washington Post Co., supra,* at 862–863:

"What is at stake here is the societal function of the First Amendment in preserving free public discussion of governmental affairs. No aspect of that constitutional guarantee is more rightly treasured than its protection of the ability of our people through free and open debate to consider and resolve their own destiny. . . . '[The] First Amendment is one of the vital bulwarks of our national commitment to intelligent self-government.' . . . It embodies our Nation's commitment to popular self-determination and our abiding faith that the surest course for developing sound national policy lies in a free exchange of views on public issues. And public debate must not only be unfettered; it must also be informed. For that reason this Court has repeatedly stated that First Amendment concerns encompass the receipt of information and ideas as well as the right of free expression." (Footnote omitted.)

model links the First Amendment to that process of communication necessary for a democracy to survive, and thus entails solicitude not only for communication itself, but also for the indispensable conditions of meaningful communication.[4]

However, because "the stretch of this protection is theoretically endless," Brennan, *supra*, at 177, it must be invoked with discrimination and temperance. For so far as the participating citizen's need for information is concerned, "[t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow." *Zemel* v. *Rusk, supra*, at 16–17. An assertion of the prerogative to gather information must accordingly be assayed by considering the information sought and the opposing interests invaded.[5]

This judicial task is as much a matter of sensitivity to practical necessities as it is of abstract reasoning. But at least

---

[4] The technique of deriving specific rights from the structure of our constitutional government, or from other explicit rights, is not novel. The right of suffrage has been inferred from the nature of "a free and democratic society" and from its importance as a "preservative of other basic civil and political rights. . . ." *Reynolds* v. *Sims*, 377 U. S. 533, 561–562 (1964); *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 34, n. 74 (1973). So, too, the explicit freedoms of speech, petition, and assembly have yielded a correlative guarantee of certain associational activities. *NAACP* v. *Button*, 371 U. S. 415, 430 (1963). See also *Rodriguez, supra*, at 33–34 (indicating that rights may be implicitly embedded in the Constitution); 411 U. S., at 62–63 (BRENNAN, J., dissenting); *id.*, at 112–115 (MARSHALL, J., dissenting); *Lamont* v. *Postmaster General*, 381 U. S. 301, 308 (1965) (BRENNAN, J., concurring).

[5] Analogously, we have been somewhat cautious in applying First Amendment protections to communication by way of nonverbal and nonpictorial conduct. Some behavior is so intimately connected with expression that for practical purposes it partakes of the same transcendental constitutional value as pure speech. See, *e. g., Tinker* v. *Des Moines School District*, 393 U. S. 503, 505–506 (1969). Yet where the connection between expression and action is perceived as more tenuous, communicative interests may be overridden by competing social values. See, *e. g., Hughes* v. *Superior Court*, 339 U. S. 460, 464–465 (1950).

two helpful principles may be sketched. First, the case for a right of access has special force when drawn from an enduring and vital tradition of public entree to particular proceedings or information. Cf. *In re Winship*, 397 U. S. 358, 361–362 (1970). Such a tradition commands respect in part because the Constitution carries the gloss of history. More importantly, a tradition of accessibility implies the favorable judgment of experience. Second, the value of access must be measured in specifics. Analysis is not advanced by rhetorical statements that all information bears upon public issues; what is crucial in individual cases is whether access to a particular government process is important in terms of that very process.

To resolve the case before us, therefore, we must consult historical and current practice with respect to open trials, and weigh the importance of public access to the trial process itself.

## II

"This nation's accepted practice of guaranteeing a public trial to an accused has its roots in our English common law heritage." *In re Oliver*, 333 U. S. 257, 266 (1948); see *Gannett Co.* v. *DePasquale*, 443 U. S., at 419–420 (BLACKMUN, J., concurring and dissenting). Indeed, historically and functionally, open trials have been closely associated with the development of the fundamental procedure of trial by jury. *In re Oliver, supra*, at 266; Radin, The Right to a Public Trial, 6 Temp. L. Q. 381, 388 (1932).[6] Pre-eminent English legal observers and commentators have unreservedly acknowledged and applauded the public character of the common-law

---

[6] "[The public trial] seems almost a necessary incident of jury trials, since the presence of a jury . . . already insured the presence of a large part of the public. We need scarcely be reminded that the jury was the *patria*, the 'country' and that it was in that capacity and not as judges, that it was summoned." Radin, The Right to a Public Trial, 6 Temp. L. Q. 381, 388 (1932); see 3 W. Blackstone, Commentaries *349 ("trial *by jury;* called also the trial *per pais*, or *by the country*"); T. Smith, De Republica Anglorum 79 (1970).

trial process. See T. Smith, De Republica Anglorum 77, 81–82 (1970); [7] 2 E. Coke, Institutes of the Laws of England 103 (6th ed. 1681); 3 W. Blackstone, Commentaries *372–*373; [8] M. Hale, The History of the Common Law of England 342–344 (6th ed. 1820); [9] 1 J. Bentham, Rationale of Judicial Evidence 584–585 (1827). And it appears that "there is little record, if any, of secret proceedings, criminal or civil, having occurred at any time in known English history." *Gannett, supra,* at 420 (BLACKMUN, J., concurring and dissenting); see also *In re Oliver, supra,* at 269, n. 22; Radin, *supra,* at 386–387.

This legacy of open justice was inherited by the English settlers in America. The earliest charters of colonial government expressly perpetuated the accepted practice of public trials. See Concessions and Agreements of West New Jersey, 1677, ch. XXIII; [10] Pennsylvania Frame of Government, 1682, Laws Agreed Upon in England, V.[11] "There is no evidence that any colonial court conducted criminal trials behind closed doors. . . ." *Gannett Co.* v. *DePasquale, supra,* at 425 (BLACKMUN, J., concurring and dissenting). Subsequently framed state constitutions also prescribed open trial proceedings. See, *e. g.,* Pennsylvania Declaration of Rights, 1776, IX; [12] North Carolina Declaration of Rights, 1776, IX; [13] Vermont Declaration of Rights, X (1777); [14] see also *In re Oliver,* 333 U. S., at 267. "Following the ratification in 1791 of the Federal Constitution's Sixth Amendment, . . . most of the original states and those subsequently admitted to

---

[7] First published in 1583.

[8] First published in 1765.

[9] First edition published in 1713.

[10] Quoted in 1 B. Schwartz, The Bill of Rights: A Documentary History 129 (1971).

[11] *Id.,* at 140.

[12] *Id.,* at 265.

[13] *Id.,* at 287.

[14] *Id.,* at 323.

the Union adopted similar constitutional provisions." *Ibid.*[15]
Today, the overwhelming majority of States secure the right
to public trials. *Gannett, supra,* at 414–415, n. 3 (BLACK-
MUN, J., concurring and dissenting); see also *In re Oliver,*
*supra,* at 267–268, 271, and nn. 17–20.

This Court too has persistently defended the public charac-
ter of the trial process. *In re Oliver* established that the Due
Process Clause of the Fourteenth Amendment forbids closed
criminal trials. Noting the "universal rule against secret
trials," 333 U. S., at 266, the Court held that

> "[i]n view of this nation's historic distrust of secret pro-
> ceedings, their inherent dangers to freedom, and the
> universal requirement of our federal and state govern-
> ments that criminal trials be public, the Fourteenth
> Amendment's guarantee that no one shall be deprived of
> his liberty without due process of law means at least that
> an accused cannot be thus sentenced to prison." *Id.,* at
> 273.[16]

---

[15] To be sure, some of these constitutions, such as the Pennsylvania
Declaration of Rights, couched their public trial guarantees in the language
of the accused's rights. But although the Court has read the Federal
Constitution's explicit public trial provision, U. S. Const., Amdt. 6, as
benefiting the defendant alone, it does not follow that comparably worded
state guarantees must be so construed. See *Gannett Co.* v. *DePasquale,*
443 U. S., at 425, and n. 9 (BLACKMUN, J., concurring and dissenting);
cf. also *Mallott* v. *State,* 608 P. 2d 737, 745, n. 12 (Alaska 1980). And
even if the specific state public trial protections must be invoked by de-
fendants, those state constitutional clauses still provide evidence of the
importance attached to open trials by the founders of our state govern-
ments. Indeed, it may have been thought that linking public trials to the
accused's privileges was the most effective way of assuring a vigorous
representative for the popular interest.

[16] Notably, *Oliver* did not rest upon the simple incorporation of the
Sixth Amendment into the Fourteenth, but upon notions intrinsic to due
process, because the criminal contempt proceedings at issue in the case
were "not within 'all criminal prosecutions' to which [the Sixth] . . .
Amendment applies." *Levine* v. *United States,* 362 U. S. 610, 616 (1960);
see also n. 1, *supra.*

Even more significantly for our present purpose, *Oliver* recognized that open trials are bulwarks of our free and democratic government: public access to court proceedings is one of the numerous "checks and balances" of our system, because "contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power," *id.*, at 270. See *Sheppard* v. *Maxwell*, 384 U. S. 333, 350 (1966). Indeed, the Court focused with particularity upon the public trial guarantee "as a safeguard against any attempt to employ our courts as instruments of persecution," or "for the suppression of political and religious heresies." *Oliver, supra,* at 270. Thus, *Oliver* acknowledged that open trials are indispensable to First Amendment political and religious freedoms.

By the same token, a special solicitude for the public character of judicial proceedings is evident in the Court's rulings upholding the right to report about the administration of justice. While these decisions are impelled by the classic protections afforded by the First Amendment to pure communication, they are also bottomed upon a keen appreciation of the structural interest served in opening the judicial system to public inspection.[17] So, in upholding a privilege for reporting truthful information about judicial misconduct proceedings, *Landmark Communications, Inc.* v. *Virginia,* 435 U. S. 829 (1978), emphasized that public scrutiny of the operation of a judicial disciplinary body implicates a major purpose of the First Amendment—"discussion of governmental affairs," *id.*, at 839. Again, *Nebraska Press Assn.* v. *Stuart,* 427 U. S., at 559, noted that the traditional guarantee against prior restraint "should have particular force as applied to reporting of criminal proceedings. . . ." And *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, 492 (1975), instructed that

[17] As Mr. Justice Holmes pointed out in his opinion for the Massachusetts Supreme Judicial Court in *Cowley* v. *Pulsifer,* 137 Mass. 392, 394 (1884), "the privilege [to publish reports of judicial proceedings] and the access of the public to the courts stand in reason upon common ground." See *Lewis* v. *Levy,* El., Bl., & El. 537, 120 Eng. Rep. 610 (K. B. 1858).

"[w]ith respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice." See *Time, Inc.* v. *Firestone,* 424 U. S. 448, 473–474, 476–478 (1976) (BRENNAN, J., dissenting) (open judicial process is essential to fulfill "the First Amendment guarantees to the people of this Nation that they shall retain the necessary means of control over their institutions . . .").

Tradition, contemporaneous state practice, and this Court's own decisions manifest a common understanding that "[a] trial is a public event. What transpires in the court room is public property." *Craig* v. *Harney,* 331 U. S. 367, 374 (1947). As a matter of law and virtually immemorial custom, public trials have been the essentially unwavering rule in ancestral England and in our own Nation. See *In re Oliver,* 333 U. S., at 266–268; *Gannett Co.* v. *DePasquale,* 443 U. S., at 386, n. 15; *id.,* at 418–432, and n. 11 (BLACKMUN, J., concurring and dissenting).[18] Such abiding adherence to the principle of open trials "reflect[s] a profound judgment about the way in which law should be enforced and justice administered." *Duncan* v. *Louisiana,* 391 U. S. 145, 155 (1968).

### III

Publicity serves to advance several of the particular purposes of the trial (and, indeed, the judicial) process. Open trials play a fundamental role in furthering the efforts of our judicial system to assure the criminal defendant a fair and accurate adjudication of guilt or innocence. See, *e. g., Estes* v. *Texas,* 381 U. S., at 538–539. But, as a feature of our

---

[18] The dictum in *Branzburg* v. *Hayes,* 408 U. S. 665, 684–685 (1972), that "[n]ewsmen . . . may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial . . . ," is not to the contrary; it simply notes that rights of access may be curtailed where there are sufficiently powerful countervailing considerations. See *supra,* at 588.

governing system of justice, the trial process serves other, broadly political, interests, and public access advances these objectives as well. To that extent, trial access possesses specific structural significance.[19]

The trial is a means of meeting "the notion, deeply rooted in the common law, that 'justice must satisfy the appearance of justice.'" *Levine* v. *United States,* 362 U. S. 610, 616 (1960), quoting *Offutt* v. *United States,* 348 U. S. 11, 14 (1954); accord, *Gannett Co.* v. *DePasquale, supra,* at 429 (BLACKMUN, J., concurring and dissenting); see *Cowley* v. *Pulsifer,* 137 Mass. 392, 394 (1884) (Holmes, J.). For a civilization founded upon principles of ordered liberty to survive and flourish, its members must share the conviction that they are governed equitably. That necessity underlies constitutional provisions as diverse as the rule against takings without just compensation, see *PruneYard Shopping Center* v. *Robins,* 447 U. S. 74, 82–83, and n. 7 (1980), and the Equal Protection Clause. It also mandates a system of justice that demonstrates the fairness of the law to our citizens. One

---

[19] By way of analogy, we have fashioned rules of criminal procedure to serve interests implicated in the trial process beside those of the defendant. For example, the exclusionary rule is prompted not only by the accused's interest in vindicating his own rights, but also in part by the independent "'imperative of judicial integrity.'" See, *e. g., Terry* v. *Ohio,* 392 U. S. 1, 12–13 (1968), quoting *Elkins* v *United States.* 364 U. S. 206, 222 (1960); *United States* v. *Calandra,* 414 U. S. 338, 357–359 (1974) (BRENNAN, J., dissenting); *Olmstead* v. *United States,* 277 U. S. 438, 484–485 (1928) (Brandeis, J., dissenting); *id.,* at 470 (Holmes, J., dissenting). And several Members of this Court have insisted that criminal entrapment cannot be "countenanced" because the "obligation" to avoid "enforcement of the law by lawless means . . . goes beyond the conviction of the particular defendant before the court. Public confidence in the fair and honorable administration of justice . . . is the transcending value at stake." *Sherman* v. *United States,* 356 U. S. 369, 380 (1958) (Frankfurter, J., concurring in result); see *United States* v. *Russell,* 411 U. S. 423, 436–439 (1973) (Douglas, J., dissenting); *id.,* at 442–443 (STEWART, J., dissenting); *Sorrells* v *United States,* 287 U. S. 435, 455 (1932) (opinion of Roberts, J.); *Casey* v *United States,* 276 U S. 413, 423, 425 (1928) (Brandeis, J., dissenting).

major function of the trial, hedged with procedural protections and conducted with conspicuous respect for the rule of law, is to make that demonstration. See *In re Oliver, supra,* at 270, n. 24.

Secrecy is profoundly inimical to this demonstrative purpose of the trial process. Open trials assure the public that procedural rights are respected, and that justice is afforded equally. Closed trials breed suspicion of prejudice and arbitrariness, which in turn spawns disrespect for law. Public access is essential, therefore, if trial adjudication is to achieve the objective of maintaining public confidence in the administration of justice. See *Gannett, supra,* at 428–429 (BLACKMUN, J., concurring and dissenting).

But the trial is more than a demonstrably just method of adjudicating disputes and protecting rights. It plays a pivotal role in the entire judicial process, and, by extension, in our form of government. Under our system, judges are not mere umpires, but, in their own sphere, lawmakers—a coordinate branch of *government*.[20] While individual cases turn upon the controversies between parties, or involve particular prosecutions, court rulings impose official and practical consequences upon members of society at large. Moreover, judges bear responsibility for the vitally important task of construing and securing constitutional rights. Thus, so far as the

---

[20] The interpretation and application of constitutional and statutory law, while not legislation, is lawmaking, albeit of a kind that is subject to special constraints and informed by unique considerations. Guided and confined by the Constitution and pertinent statutes, judges are obliged to be discerning, to exercise judgment, and to prescribe rules. Indeed, at times judges wield considerable authority to formulate legal policy in designated areas. See, *e. g., Moragne* v. *States Marine Lines,* 398 U. S. 375 (1970); *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398 (1964); *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448, 456–457 (1957); P. Areeda, Antitrust Analysis 45–46 (2d ed. 1974) ("Sherman Act [is] . . . a general authority to do what common law courts usually do: to use certain customary techniques of judicial reasoning . . . and to develop, refine, and innovate in the dynamic common law tradition").

trial is the mechanism for judicial factfinding, as well as the initial forum for legal decisionmaking, it is a genuine governmental proceeding.

It follows that the conduct of the trial is pre-eminently a matter of public interest. See *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S., at 491–492; *Maryland* v. *Baltimore Radio Show, Inc.,* 338 U. S. 912, 920 (1950) (opinion of Frankfurter, J., respecting denial of certiorari). More importantly, public access to trials acts as an important check, akin in purpose to the other checks and balances that infuse our system of government. "The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power," *In re Oliver,* 333 U. S., at 270—an abuse that, in many cases, would have ramifications beyond the impact upon the parties before the court. Indeed, " '[w]ithout publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account.' " *Id.,* at 271, quoting 1 J. Bentham, Rationale of Judicial Evidence 524 (1827); see 3 W. Blackstone, Commentaries *372; M. Hale, History of the Common Law of England 344 (6th ed. 1820); 1 J. Bryce, The American Commonwealth 514 (rev. 1931).

Finally, with some limitations, a trial aims at true and accurate factfinding. Of course, proper factfinding is to the benefit of criminal defendants and of the parties in civil proceedings. But other, comparably urgent, interests are also often at stake. A miscarriage of justice that imprisons an innocent accused also leaves a guilty party at large, a continuing threat to society. Also, mistakes of fact in civil litigation may inflict costs upon others than the plaintiff and defendant. Facilitation of the trial factfinding process, therefore, is of concern to the public as well as to the parties.[21]

Publicizing trial proceedings aids accurate factfinding. "Public trials come to the attention of key witnesses unknown

---

[21] Further, the interest in insuring that the innocent are not punished may be shared by the general public, in addition to the accused himself.

to the parties." *In re Oliver, supra,* at 270, n. 24; see *Tanksley* v. *United States,* 145 F. 2d 58, 59 (CA9 1944); 6 J. Wigmore, Evidence § 1834 (J. Chadbourn rev. 1976). Shrewd legal observers have averred that

> "open examination of witnesses *viva voce,* in the presence of all mankind, is much more conducive to the clearing up of truth, than the private and secret examination . . . where a witness may frequently depose that in private, which he will be ashamed to testify in a public and solemn tribunal." 3 Blackstone, *supra,* at \*373.

See *Tanksley* v. *United States, supra,* at 59–60; Hale, *supra,* at 345; 1 Bentham, *supra,* at 522–523. And experience has borne out these assertions about the truthfinding role of publicity. See Hearings on S. 290 before the Subcommittee on Constitutional Rights and the Subcommittee on Improvements in Judicial Machinery of the Senate Judiciary Committee, 89th Cong., 1st Sess., pt. 2, pp. 433–434, 437–438 (1966).

Popular attendance at trials, in sum, substantially furthers the particular public purposes of that critical judicial proceeding.[22] In that sense, public access is an indispensable element of the trial process itself. Trial access, therefore, assumes structural importance in our "government of laws," *Marbury* v. *Madison,* 1 Cranch 137, 163 (1803).

## IV

As previously noted, resolution of First Amendment public access claims in individual cases must be strongly influenced

---

[22] In advancing these purposes, the availability of a trial transcript is no substitute for a public presence at the trial itself. As any experienced appellate judge can attest, the "cold" record is a very imperfect reproduction of events that transpire in the courtroom. Indeed, to the extent that publicity serves as a check upon trial officials, "[r]ecordation . . . would be found to operate rather as cloa[k] than chec[k]; as cloa[k] in reality, as chec[k] only in appearance." *In re Oliver,* 333 U. S., at 271, quoting 1 J. Bentham, Rationale of Judicial Evidence 524 (1827); see *id.,* at 577–578.

by the weight of historical practice and by an assessment of the specific structural value of public access in the circumstances. With regard to the case at hand, our ingrained tradition of public trials and the importance of public access to the broader purposes of the trial process, tip the balance strongly toward the rule that trials be open.[23] What countervailing interests might be sufficiently compelling to reverse this presumption of openness need not concern us now,[24] for the statute at stake here authorizes trial closures at the unfettered discretion of the judge and parties.[25] Accordingly, Va. Code § 19.2-266 (Supp. 1980) violates the First and Fourteenth Amendments, and the decision of the Virginia Supreme Court to the contrary should be reversed.

MR. JUSTICE STEWART, concurring in the judgment.

In *Gannett Co.* v. *DePasquale,* 443 U. S. 368, the Court held that the Sixth Amendment, which guarantees "the accused" the right to a public trial, does not confer upon representatives of the press or members of the general public any right of access to a trial.[1] But the Court explicitly left

---

[23] The presumption of public trials is, of course, not at all incompatible with reasonable restrictions imposed upon courtroom behavior in the interests of decorum. Cf. *Illinois* v. *Allen,* 397 U. S. 337 (1970). Thus, when engaging in interchanges at the bench, the trial judge is not required to allow public or press intrusion upon the huddle. Nor does this opinion intimate that judges are restricted in their ability to conduct conferences in chambers, inasmuch as such conferences are distinct from trial proceedings.

[24] For example, national security concerns about confidentiality may sometimes warrant closures during sensitive portions of trial proceedings, such as testimony about state secrets. Cf *United States* v. *Nixon,* 418 U. S. 683, 714-716 (1974).

[25] Significantly, closing a trial lacks even the justification for barring the door to pretrial hearings: the necessity of preventing dissemination of suppressible prejudicial evidence to the public before the jury pool has become, in a practical sense, finite and subject to sequestration.

[1] The Court also made clear that the Sixth Amendment does not give the accused the right to a *private* trial 443 U S., at 382. Cf. *Singer* v.

open the question whether such a right of access may be guaranteed by other provisions of the Constitution, *id.*, at 391–393. MR. JUSTICE POWELL expressed the view that the First and Fourteenth Amendments do extend at least a limited right of access even to pretrial suppression hearings in criminal cases, *id.*, at 397–403 (concurring opinion). MR. JUSTICE REHNQUIST expressed a contrary view, *id.*, at 403–406 (concurring opinion). The remaining Members of the Court were silent on the question.

Whatever the ultimate answer to that question may be with respect to pretrial suppression hearings in criminal cases, the First and Fourteenth Amendments clearly give the press and the public a right of access to trials themselves, civil as well as criminal.[2] As has been abundantly demonstrated in Part II of the opinion of THE CHIEF JUSTICE, in MR. JUSTICE BRENNAN's opinion concurring in the judgment, and in MR. JUSTICE BLACKMUN's opinion dissenting in part last Term in the *Gannett* case, *supra,* at 406, it has for centuries been a basic presupposition of the Anglo-American legal system that trials shall be public trials. The opinions referred to also convincingly explain the many good reasons why this is so. With us, a trial is by very definition a proceeding open to the press and to the public.

In conspicuous contrast to a military base, *Greer* v. *Spock,* 424 U. S. 828; a jail, *Adderley* v. *Florida,* 385 U. S. 39; or a prison, *Pell* v. *Procunier,* 417 U. S. 817, a trial courtroom is a public place. Even more than city streets, sidewalks, and

---

*United States,* 380 U. S. 24 (Sixth Amendment right of trial by jury does not include right to be tried without a jury).

[2] It has long been established that the protections of the First Amendment are guaranteed by the Fourteenth Amendment against invasion by the States. *E. g., Gitlow* v. *New York,* 268 U. S. 652. The First Amendment provisions relevant to this case are those protecting free speech and a free press. The right to speak implies a freedom to listen, *Kleindienst* v. *Mandel,* 408 U. S. 753. The right to publish implies a freedom to gather information, *Branzburg* v. *Hayes,* 408 U. S. 665, 681. See opinion of MR. JUSTICE BRENNAN concurring in the judgment, *ante,* p. 584, *passim.*

parks as areas of traditional First Amendment activity, *e. g.,
Shuttlesworth* v. *Birmingham,* 394 U. S. 147, a trial court-
room is a place where representatives of the press and of the
public are not only free to be, but where their presence serves
to assure the integrity of what goes on.

But this does not mean that the First Amendment right
of members of the public and representatives of the press to
attend civil and criminal trials is absolute. Just as a legisla-
ture may impose reasonable time, place, and manner restric-
tions upon the exercise of First Amendment freedoms, so may
a trial judge impose reasonable limitations upon the unre-
stricted occupation of a courtroom by representatives of the
press and members of the public. Cf. *Sheppard* v. *Maxwell,*
384 U. S. 333. Much more than a city street, a trial court-
room must be a quiet and orderly place. Compare *Kovacs*
v. *Cooper,* 336 U. S. 77, with *Illinois* v. *Allen,* 397 U. S. 337,
and *Estes* v. *Texas,* 381 U. S. 532. Moreover, every court-
room has a finite physical capacity, and there may be occa-
sions when not all who wish to attend a trial may do so.[3]
And while there exist many alternative ways to satisfy the
constitutional demands of a fair trial,[4] those demands may
also sometimes justify limitations upon the unrestricted pres-
ence of spectators in the courtroom.[5]

Since in the present case the trial judge appears to have

[3] In such situations, representatives of the press must be assured access.
*Houchins* v. *KQED, Inc.,* 438 U. S. 1, 16 (opinion concurring in judgment).

[4] Such alternatives include sequestration of juries, continuances, and
changes of venue.

[5] This is not to say that only constitutional considerations can justify
such restrictions. The preservation of trade secrets, for example, might
justify the exclusion of the public from at least some segments of a civil
trial. And the sensibilities of a youthful prosecution witness, for exam-
ple, might justify similar exclusion in a criminal trial for rape, so long as
the defendant's Sixth Amendment right to a public trial were not impaired.
See, *e. g., Stamicarbon, N. V.* v. *American Cyanamid Co.,* 506 F. 2d
532, 539–542 (CA2 1974).

given no recognition to the right of representatives of the press and members of the public to be present at the Virginia murder trial over which he was presiding, the judgment under review must be reversed.

It is upon the basis of these principles that I concur in the judgment.

MR. JUSTICE BLACKMUN, concurring in the judgment.

My opinion and vote in partial dissent last Term in *Gannett Co.* v. *DePasquale,* 443 U. S. 368, 406 (1979), compels my vote to reverse the judgment of the Supreme Court of Virginia.

I

The decision in this case is gratifying for me for two reasons:

It is gratifying, first, to see the Court now looking to and relying upon legal history in determining the fundamental public character of the criminal trial. *Ante,* at 564–569, 572–574, and n. 9. The partial dissent in *Gannett,* 443 U. S., at 419–433, took great pains in assembling—I believe adequately—the historical material and in stressing its importance to this area of the law. See also MR. JUSTICE BRENNAN's helpful review set forth as Part II of his opinion in the present case. *Ante,* at 589–593. Although the Court in *Gannett* gave a modicum of lip service to legal history, 443 U. S., at 386, n. 15, it denied its obvious application when the defense and the prosecution, with no resistance by the trial judge, agreed that the proceeding should be closed.

The Court's return to history is a welcome change in direction.

It is gratifying, second, to see the Court wash away at least some of the graffiti that marred the prevailing opinions in *Gannett.* No fewer than 12 times in the primary opinion in that case, the Court (albeit in what seems now to have be-

come clear dicta) observed that its Sixth Amendment closure ruling applied to the *trial* itself. The author of the first concurring opinion was fully aware of this and would have restricted the Court's observations and ruling to the suppression hearing. *Id.*, at 394. Nonetheless, he *joined* the Court's opinion, *ibid.*, with its multiple references to the trial itself; the opinion was not a mere concurrence in the Court's judgment. And MR. JUSTICE REHNQUIST, in his separate concurring opinion, quite understandably observed, as a consequence, that the Court was holding "without qualification," that " 'members of the public have no constitutional right under the Sixth and Fourteenth Amendments to attend criminal trials,' " *id.*, at 403, quoting from the primary opinion, *id.*, at 391. The resulting confusion among commentators[1] and journalists[2] was not surprising.

[1] See, *e. g.*, Stephenson, Fair Trial-Free Press: Rights in Continuing Conflict, 46 Brooklyn L. Rev. 39, 63 (1979) ("intended reach of the majority opinion is unclear" (footnote omitted)); The Supreme Court, 1978 Term, 93 Harv. L. Rev. 60, 65 (1979) ("widespread uncertainty over what the Court held"); Note, 51 U. Colo. L. Rev. 425, 432–433 (1980) ("*Gannett* can be interpreted to sanction the closing of trials"; citing "the uncertainty of the language in *Gannett*," and its "ambiguous sixth amendment holding"); Note, 11 Tex. Tech. L. Rev. 159, 170–171 (1979) ("perhaps much of the present and imminent confusion lies in the Court's own statement of its holding"); Borow & Kruth, Closed Preliminary Hearings, 55 Calif. State Bar J. 18, 23 (1980) ("Despite the public disclaimers . . . , the majority holding appears to embrace the right of access to trials as well as pretrial hearings"); Goodale, Gannett Means What it Says; But Who Knows What it Says?, Nat. L. J., Oct. 15, 1979, p. 20; see also Keeffe, The Boner Called Gannett, 66 A. B. A. J. 227 (1980).

[2] The press—perhaps the segment of society most profoundly affected by *Gannett*—has called the Court's decision "cloudy," Birmingham Post-Herald, Aug. 21, 1979, p. A4; "confused," Chicago Sun-Times, Sept. 20, 1979, p. 56 (cartoon); "incoherent," Baltimore Sun, Sept. 22, 1979, p. A14; "mushy," Washington Post, Aug. 10, 1979, p. A15; and a "muddle," Time, Sept. 17, 1979, p. 82, and Newsweek, Aug. 27, 1979, p. 69.

## II

The Court's ultimate ruling in *Gannett*, with such clarification as is provided by the opinions in this case today, apparently is now to the effect that there is no *Sixth* Amendment right on the part of the public—or the press—to an open hearing on a motion to suppress. I, of course, continue to believe that *Gannett* was in error, both in its interpretation of the Sixth Amendment generally, and in its application to the suppression hearing, for I remain convinced that the right to a public trial is to be found where the Constitution explicitly placed it—in the Sixth Amendment.[3]

The Court, however, has eschewed the Sixth Amendment route. The plurality turns to other possible constitutional sources and invokes a veritable potpourri of them—the Speech Clause of the First Amendment, the Press Clause, the Assembly Clause, the Ninth Amendment, and a cluster of penumbral guarantees recognized in past decisions. This course is troublesome, but it is the route that has been selected and, at least for now, we must live with it. No purpose would be served by my spelling out at length here the reasons for my saying that the course is troublesome. I need do no more than observe that uncertainty marks the nature—and strictness—of the standard of closure the Court adopts. The plurality opinion speaks of "an overriding interest articulated in findings," *ante,* at 581; MR. JUSTICE STEWART reserves, perhaps not inappropriately, "reasonable limitations," *ante,* at 600; MR. JUSTICE BRENNAN presents his separate analytical framework; MR. JUSTICE POWELL in *Gannett* was critical of those Justices who, relying on the Sixth Amendment, concluded

---

[3] I shall not again seek to demonstrate the errors of analysis in the Court's opinion in *Gannett.* I note, however, that the very existence of the present case illustrates the utter fallacy of thinking, in this context, that "the public interest is fully protected by the participants in the litigation." *Gannett Co.* v. *DePasquale,* 443 U. S., at 384. Cf. *id.,* at 438–439 (opinion in partial dissent).

that closure is authorized only when "strictly and inescapably necessary," 443 U. S., at 339–400; and MR. JUSTICE REHNQUIST continues his flat rejection of, among others, the First Amendment avenue.

Having said all this, and with the Sixth Amendment set to one side in this case, I am driven to conclude, as a secondary position, that the First Amendment must provide some measure of protection for public access to the trial. The opinion in partial dissent in *Gannett* explained that the public has an intense need and a deserved right to know about the administration of justice in general; about the prosecution of local crimes in particular; about the conduct of the judge, the prosecutor, defense counsel, police officers, other public servants, and all the actors in the judicial arena; and about the trial itself. See 443 U. S., at 413, and n. 2, 414, 428–429, 448. See also *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, 492 (1975). It is clear and obvious to me, on the approach the Court has chosen to take, that, by closing this criminal trial, the trial judge abridged these First Amendment interests of the public.

I also would reverse, and I join the judgment of the Court.

MR. JUSTICE REHNQUIST, dissenting.

In the Gilbert and Sullivan operetta "Iolanthe," the Lord Chancellor recites:

"The Law is the true embodiment
of everything that's excellent,
It has no kind of fault or flaw,
And I, my Lords, embody the Law."

It is difficult not to derive more than a little of this flavor from the various opinions supporting the judgment in this case. The opinion of THE CHIEF JUSTICE states:

"[H]ere for the first time the Court is asked to decide whether a criminal trial itself may be closed to the public upon the unopposed request of a defendant, without any

demonstration that closure is required to protect the defendant's superior right to a fair trial, or that some other overriding consideration requires closure." *Ante,* at 564.

The opinion of MR. JUSTICE BRENNAN states:

"Read with care and in context, our decisions must therefore be understood as holding only that any privilege of access to governmental information is subject to a degree of restraint dictated by the nature of the information and countervailing interests in security or confidentiality." *Ante,* at 586.

For the reasons stated in my separate concurrence in *Gannett Co.* v. *DePasquale,* 443 U. S. 368, 403 (1979), I do not believe that either the First or Sixth Amendment, as made applicable to the States by the Fourteenth, requires that a State's reasons for denying public access to a trial, where both the prosecuting attorney and the defendant have consented to an order of closure approved by the judge, are subject to any additional constitutional review at our hands. And I most certainly do not believe that the Ninth Amendment confers upon us any such power to review orders of state trial judges closing trials in such situations. See *ante,* at 579, n. 15.

We have at present 50 state judicial systems and one federal judicial system in the United States, and our authority to reverse a decision by the highest court of the State is limited to only those occasions when the state decision violates some provision of the United States Constitution. And that authority should be exercised with a full sense that the judges whose decisions we review are making the same effort as we to uphold the Constitution. As said by Mr. Justice Jackson, concurring in the result in *Brown* v. *Allen,* 344 U. S. 443, 540 (1953), "we are not final because we are infallible, but we are infallible only because we are final."

The proper administration of justice in any nation is bound to be a matter of the highest concern to all thinking citizens.

But to gradually rein in, as this Court has done over the past generation, all of the ultimate decisionmaking power over how justice shall be administered, not merely in the federal system but in each of the 50 States, is a task that no Court consisting of nine persons, however gifted, is equal to. Nor is it desirable that such authority be exercised by such a tiny numerical fragment of the 220 million people who compose the population of this country. In the same concurrence just quoted, Mr. Justice Jackson accurately observed that "[t]he generalities of the Fourteenth Amendment are so indeterminate as to what state actions are forbidden that this Court has found it a ready instrument, in one field or another, to magnify federal, and incidentally its own, authority over the states." *Id.*, at 534.

However high-minded the impulses which originally spawned this trend may have been, and which impulses have been accentuated since the time Mr. Justice Jackson wrote, it is basically unhealthy to have so much authority concentrated in a small group of lawyers who have been appointed to the Supreme Court and enjoy virtual life tenure. Nothing in the reasoning of Mr. Chief Justice Marshall in *Marbury* v. *Madison,* 1 Cranch 137 (1803), requires that this Court through ever-broadening use of the Supremacy Clause smother a healthy pluralism which would ordinarily exist in a national government embracing 50 States.

The issue here is not whether the "right" to freedom of the press conferred by the First Amendment to the Constitution overrides the defendant's "right" to a fair trial conferred by other Amendments to the Constitution; it is instead whether any provision in the Constitution may fairly be read to prohibit what the trial judge in the Virginia state-court system did in this case. Being unable to find any such prohibition in the First, Sixth, Ninth, or any other Amendment to the United States Constitution, or in the Constitution itself, I dissent.