The SACRAMENTO BEE, published by McClatchy Newspapers, Petitioner,

v.

UNITED STATES DISTRICT COURT FOR the EASTERN DISTRICT OF CALIFORNIA, NORTHERN DIVISION, Respondent,

United States of America, William Dale Smith, Cheryl Bickford, James Cameron, Julius Fisherman, Norman Heifner, Andrew Pope, and Norman Truax, Real Parties In Interest.

No. 81–7255.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 15, 1981.

Decided Sept. 14, 1981.

As Corrected on Denial of Rehearing and Rehearing En Banc Nov. 6, 1981.

the APA. 36 Fed.Reg. 2532 (1971); *Good Samaritan Hospital, Corvallis v. Mathews*, 609 F.2d 949, 954 (9th Cir. 1979).

Douglas T. Foster, Sacramento, Cal., for petitioner.

E. Richard Walker, Sacramento, Cal., for respondent.

Before WRIGHT, TRASK and ANDERSON, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

The Sacramento Bee petitions for a writ of mandamus directing the district court to issue no further orders excluding the press from any stage of a criminal trial. We conclude that the court's decision to close two brief hearings during the course of a two-month trial, after it had carefully considered alternatives and made findings in support of its closure decision, does not warrant issuance of the writ.

*FACTS*

The jury trial of seven of 22 persons indicted for trafficking in heroin began in Sacramento early in March 1981. Before trial, the defendants and the approaching trial were well publicized by the Bee.

In selecting a jury, the judge determined that the jurors had no prejudicial information. After selection, he instructed the jury to avoid any media accounts of the trial.

At the start of the trial, the Bee published a story about the prior criminal activities of one defendant. Counsel for that accused, joined by other defense counsel, moved to sequester the jury. Having learned that one juror had seen but not read the story, the judge granted the motion.

It appeared, after a conference with the federal marshal, that sequestration would require two weeks to arrange, would require housing of the jurors away from their homes, constant attendance by marshals, and transportation by chartered bus with covered windows.

Defense counsel then decided the sequestration was not in the best interests of their clients. The earlier order was vacated, and the court directed that government personnel, defense counsel, court personnel and the defendants refrain from communicating with the press about the trial.

The court admonished the jurors again to ignore media reports about the trial and directed them to have family members remove from newspapers any accounts of the trial.

After another Bee article about the trial on March 31, the court polled the jury. The juror who had seen the earlier story had read the later one and learned of inadmissible evidence about alleged organized crime connections of one defendant. Because of the prejudicial nature of that information, the court removed that juror.

On April 3, the court excused the jury, the public and the press from the courtroom for an evidentiary side bar conference. The defendants and their families remained. Neither the press nor public objected and the court made no findings supporting closure.

On April 7, in open court without the jury, the court excluded the press, but allowed the public to remain while the government made an offer of proof.

When a Bee reporter asked for reasons to justify closure, the judge said that he feared that the jury might learn indirectly of inadmissible evidence. He noted that one juror already had been disqualified for that reason.

He explained that he had tried to balance the rights of the news media and the defendants by refusing to sequester the jury, and by refusing to exclude the press from each motion out of the presence of the jury. He proposed that motions to exclude the press would be considered as each problem arose, and said that he would grant such motions only "where there is a substantial possibility that evidence will not be put before the jury, [because] I don't want them to get it indirectly through the media." The reporter left the courtroom without objecting.

Counsel for the Bee appeared on April 8 and objected to exclusion of the press. The judge told him

I am just telling you that I sat and thought through every alternative that I could find that I have been able to think of and they all don't meet the problem. Now I am anxious for you to supply me with an alternative that would work.

When counsel for the Bee suggested sequestration, the judge explained that was not feasible because it would mean

in effect, putting the jury in prison, in effect putting them in a posture in which there will be deep resentment against the Court, and perhaps the government, and perhaps the defendants in this matter, having results which will be unpredictable but clearly serious.

He explained the mechanical complications of sequestration. He noted also that the jury was annoyed at the length of the trial, then in its eighth week, and said that sequestration could impose otherwise avoidable hardships because the jury had received no advance warning. One juror, a pregnant woman, might have asked to be excused had she known sequestration was possible.

When the court asked the parties again about sequestration, all said that they preferred exclusion of the media.

On April 10, a Bee attorney restated the newspaper's opposition to closure. The court again considered and rejected admonishing the jury because one juror had been excused after he learned of inadmissible evidence, despite warnings to avoid news accounts of the trial.

It rejected the suggestion to clip the jurors' newspapers because the electronic media were broadcasting the newspaper's stories, the excused juror had learned of the prejudicial information despite taking that precaution, and it would be impractical to have marshals go to jurors' homes to remove stories of the trial from all newspapers.

The Bee again suggested sequestration, but offered no new arguments or better suggestions.

The judge rejected considering evidentiary matters in side bar discussions because it would be "terribly inhibiting to whisper with the jury here when there are important things to be said which I want to think about and hear clearly."

When defense attorney suggested holding evidentiary hearings in chambers or in the jury room, Bee counsel challenged the right of the court to hold bench conferences on evidentiary questions.

Finally, the court said that closure caused only a temporary denial of information because reporters' transcripts would be available immediately at the end of the trial.

## DISCUSSION

### I

#### Jurisdiction

The Bee seeks a writ of mandamus under 28 U.S.C. § 1651 and has standing because it was excluded from a criminal trial and was inhibited from reporting news. See *United States v. Gurney*, 558 F.2d 1202, 1206 (5th Cir. 1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978). The case is not moot, although the trial is completed, because closure orders are likely to escape appellate review. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 563, 100 S.Ct. 2814, 2820, 65 L.Ed.2d 973 (1980).

### II

#### Standard of Review

Writs of mandate are issued only in extraordinary circumstances, guided by

these factors, all of which need not be present

'(1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires, (2) the petitioner will be damaged or prejudiced in a way not correctable on appeal, (3) the district court's order is clearly erroneous as a matter of law, (4) the district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules, and (5) the district court's order raises new and important problems, or issues of first impression.' (citations omitted)

*Wheeler v. United States*, 640 F.2d 1116, 1120 n.9 (9th Cir. 1981).

The first, second and fifth factors weigh heavily in favor of issuance of the writ because (1) the Bee is not a party to the criminal case and lacks standing to bring a direct appeal, *see United States v. Sherman*, 581 F.2d 1358, 1360 (9th Cir. 1978), (2) the court could continue to close hearings at criminal trials before an appeal could be heard, and (3) this case raises an important issue of first impression.

The fourth factor does not support issuance because two closure orders in an unusually well-publicized criminal trial do not qualify as oft-repeated error.

█ The key factor is whether the closure orders are so clearly erroneous as a matter of law that the Bee's right to issuance of the writ is clear and indisputable. *See Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980).

### III.

#### The Closure Orders

In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the Supreme Court held that the press has a First Amendment right of access to a criminal trial.[1]

The plurality said that the court should consider alternatives to closure, and that "[a]bsent an overriding interest articulated in findings, the trial of a criminal case must be open to the public." *Id.* at 581, 100 S.Ct. at 2830. It held that the trial court improperly closed the trial because the judge made no findings to support closure, made no inquiry into less intrusive alternatives, such as sequestration, and did not recognize the public's and the press's constitutional right to attend a trial. *Id.*

█ It cautioned that this right of access is not absolute and that courts may still impose reasonable restrictions to ensure a fair trial. *Id.* at 581 n.18, 100 S.Ct. at 2830 n.18. It did not, however, indicate how courts should balance these interests.

*Richmond Newspapers* followed a confusing decision in *Gannett Co., Inc. v. De Pasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), which sustains closure of a pretrial suppression hearing and concludes that the Sixth Amendment right to a public trial is personal to the defendant and may not be used to support a right of access by the press or public. *Id.* at 379–84, 99 S.Ct. at 2905–08. In five separate opinions, seven of the nine justices used balancing tests to determine whether the defendant's right to a fair trial took precedence over the rights of the press and public.[2]

Justice Stewart, in the plurality opinion, looked to these factors: (1) was objection made at the time of the closure? (2)did the public have a chance to object upon request? (3) did the court balance the public's First Amendment rights against the defendant's Sixth Amendment rights? (4) was the denial of access based on a "reasonable probability of prejudice" to the defendants? and (5) was the denial absolute, or would a transcript be made available after

---

1. Seven justices reached this result. Justice Powell did not participate and Justice Rehnquist dissented.

2. Chief Justice Burger voted to uphold the court's closure order on the basis that it re-stricted public access to a pretrial hearing rather than a hearing at trial. Justice Rehnquist alone believed that the press had no rights to balance.

the danger of prejudice passed? *Id.* at 392–93, 99 S.Ct. at 2911–12.

Justice Blackmun, dissenting, developed a balancing test permitting exclusion of the press from a pretrial hearing only if "strictly and inescapably necessary" to preserve the fairness of a criminal trial. *Id.* 440, 99 S.Ct. at 2936.

Justice Powell, the sole advocate of the press's First Amendment right of access, considered these factors relevant to closure decisions:

(A) Those present when the motion for closure is made must have an opportunity to be heard.

(B) The defendant must "make some showing that the fairness of his trial likely will be prejudiced by public access to the proceedings."

(C) Those objecting to closure must show that reasonable alternatives are available and the court must consider whether they would preserve the fairness of trial without interfering substantially with the right of access.

(D) The exclusion must be no more extensive than required. *Id.* at 400–01, 99 S.Ct. at 2916–17.

■ These cases indicate clearly that the right of access is not absolute and must be balanced against the defendant's Sixth Amendment right to a fair trial. A court faced with a closure motion must give those present a chance to object, consider less intrusive alternatives, articulate its reasons for closure in findings, determine that the defendant's right to a fair trial will be prejudiced by public access, and make the exclusion as narrow as possible.

■ Judge Karlton met these requirements. He allowed the press an opportunity to object to closure and held a hearing on the matter after the second exclusion. There being no objection to the first closure, a hearing was unnecessary.

He gave careful and adequate consideration to less intrusive alternatives, although he did not consider all possible ones, and made sufficient findings to support his rejection of them. He rejected further admonitions to the jury to avoid media accounts of the trial and having press accounts clipped because one juror had already been tainted and removed despite those precautions.

■ He rejected sequestration because of the onerous burden it placed on jurors and on the court at that time in a trial already unduly protracted.[3] He eliminated side bar conferences because of the number of counsel and court personnel involved and because of the desire to avoid giving the jury the belief that secret information was being kept from it.

Although the court did not consider other alternatives, it informed Bee counsel repeatedly that no others were apparent and asked counsel for suggestions. Experienced counsel failed to offer anything new and simply disputed the court's reasons why the rejected alternatives were inadequate.

■ We are puzzled, as we said to counsel at oral argument, that representatives of the press failed to suggest a logical and workable alternative to solve the court's dilemma. An easy solution would have been to acknowledge that immediate publication was unnecessary and that the Bee would await later developments in the trial until the material withheld from the jury might be printed without prejudice to any defendant and without inconveniencing the jury.

■ While we conclude that the court made the required inquiry, several other alternatives should normally be considered before closure. The court should seek first a voluntary agreement with the press about the timing and scope of coverage, with an agreed upon delay being as brief as possible. [(*See generally*)] *ABA*

---

**3.** Sequestration might have been preferable if the trial had been shorter or if the need to exclude the press during the trial was known before the jury was impanelled.

 

*Project on Standards for Criminal Justice, Fair Trial and Free Press Standard* 8–3.6 (1980) [(citing similar rationale in ABA Standard 8–3.2)].[4]

If the press does not cooperate, the court should consider a continuance, severance, change of venue, change of venire, intensive voir dire, and additional peremptory challenges, in addition to sequestration, admonishing instructions, clipping of newspapers, and side bar and in chamber hearings. The stage of trial at which the closure motion is made will dictate which alternatives should be considered.

■ The record indicates that the court's conclusion that the defendants' right to a fair trial would be prejudiced by press access to the two evidentiary hearings was well-founded. Experience demonstrated that the Bee would publish inadmissible evidence that would come to the jurors' attention despite all precautions and that there was a substantial likelihood that evidence presented at the two closed hearings also would be inadmissible.

The court's first order excluding the public and the press from that evidentiary hearing but refusing to exclude them from all hearings held outside the presence of the jury, satisfies the requirement that the exclusion be as narrow as possible. There is sufficient indication that the evidence was prejudicial and inadmissible and that the exclusion was temporary because the court agreed to release the transcript of the closed proceeding at the end of trial.

■ The second exclusion order, excluding the press but not the public, was drawn too narrowly because the press may have the same access to public trials as does the public. *See Richmond Newspapers,* 448 U.S. at 577 n.12, 100 S.Ct. at 2827 n.12; *Estes v. Texas,* 381 U.S. 532, 540, 85 S.Ct. 1628, 1631, 14 L.Ed.2d 543 (1965). This error, taken in the context of a protracted trial in which the judge carefully balanced the First and Sixth Amendment rights, is insufficient to justify the issuance of the writ of mandate.

4. This alternative, however, should not be confused with a gag order restraining the press from publishing information presented at a criminal trial. Gag orders are unlawful except

## CONCLUSION

The district court's conscientious consideration and balancing of the rights of the defendants and the media satisfy the constitutional requirement that criminal trials be open to the press and public in the absence of "an overriding interest articulated in findings." *Richmond Newspapers,* 448 U.S. at 581, 100 S.Ct. at 2830. Although we conclude that preferable alternatives to closure exist, the judge's failure to consider them in the middle of a long and difficult criminal trial does not present such clear error as to warrant the grant of the extraordinary writ of mandamus.

The petition for the writ is denied.

under the most compelling circumstances. *See Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).