**GLOBE NEWSPAPER COMPANY, Gerard M. O'Neill, and Diego Ribadeneira, Plaintiffs,**

v.

**Daniel F. POKASKI, Clerk–Magistrate for Criminal Business of the Suffolk Superior Court, and John J. Desmond, Clerk–Magistrate for Suffolk Superior Court, West Roxbury Division, Defendants.**

Civ. A. No. 87–2140–T.

United States District Court, D. Massachusetts.

April 27, 1988.

E. Susan Garsh, Jonathan M. Albano, Joanne D'Alcomo, Bingham, Dana & Gould, Boston, Mass., for plaintiffs.

Judith Fabricant, H. Reed Witherby, Asst. Atty. Gen., Boston, Mass., for defendants.

## MEMORANDUM

TAURO, District Judge.

Plaintiffs, the Globe Newspaper Company and two *Boston Globe* reporters, Gerard M. O'Neill and Diego Ribadeneira, have challenged the constitutionality of a Massachusetts statute that limits their access to criminal trial records.

### I.

The challenged statute, Mass.Gen.L. ch. 276, § 100C,[1] among other things, seals the

---

1. Mass.Gen.L. ch. 276, § 100C provides, in relevant part:

In any criminal case wherein the defendant has been found not guilty by the court or jury, or a no bill has been returned by the grand jury, or a finding of no probable cause has been made by the court, the commissioner of probation shall seal said court appearance and disposition recorded in his files and the clerk and the probation officers of the courts

records of any criminal case in which the defendant has been found not guilty. The statute is intended to protect the reputations and privacy of acquitted criminal defendants. It accomplishes this goal by "protect[ing] individuals from unnecessary and overbroad dissemination of criminal record information." *Commonwealth v. Vickey*, 381 Mass. 762, 765, 412 N.E.2d 877 (1980).

As part of a *Globe* investigation concerning the number and disposition of cases involving alleged sexual offenses against children, O'Neill sought to review relevant docket sheets. Docket sheets generally contain the defendant's name, the charge, the dates of hearings and other significant events, including disposition of the charges. O'Neill alleges that, in certain cases, the docket sheets contained only the docket number and the word "sealed" and, therefore, no substantive information was available to him. Similarly, Ribadeneira alleges that he was unable to verify a tip concerning the disposition of drug charges against a Boston police officer, because the docket and file were sealed.

Asserting that § 100C imposes a blanket seal, without providing an opportunity for particularized evaluations in individual cases, plaintiffs argue that the statute is inconsistent with the constitutional right of access to judicial proceedings guaranteed by the First and Fourteenth Amendments. This court agrees.

## II.

█ The Supreme Court first recognized the public's right of access to judicial proceedings in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). Holding that the trial court erred in closing a murder trial, seven justices [2] agreed that the First Amendment protects the public from being summarily or arbitrarily barred from observing trials. "Absent an overriding interest articulated in findings," wrote Chief Justice Burger, "the trial of a criminal case must be open to the public." 448 U.S. at 581, 100 S.Ct. at 2829 (plurality opinion).

Subsequent Supreme Court opinions have further explained the nature of this access right. In *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), the Court held unconstitutional a Massachusetts statute that excluded the public from all trials of sexual offenses involving a minor victim. Importantly, the Court's decision turned on the fact that the trial closure law—like the sealed records provision at issue here—imposed a blanket ban on public access to an entire class of trials, without creating a procedure for individualized determinations in particular cases. The Court adopted the following rule:

> Where ... the State attempts to deny a right of access in order to inhibit the

in which the proceedings occurred or were initiated shall likewise seal the records of the proceedings in their files. The provisions of this paragraph shall not apply if the defendant makes a written request to the commissioner not to seal the records of the proceedings.

In any criminal case wherein a nolle prosequi has been entered, or a dismissal has been entered by the court, except in cases in which an order of probation has been terminated, and it appears to the court that substantial justice would best be served, the court shall direct the clerk to seal the records of the proceedings in his files. The clerk shall forthwith notify the commissioner of probation and the probation officer of the courts in which the proceedings occurred or were initiated who shall likewise seal the records of the proceedings in their files.

**2.** Chief Justice Burger, in a plurality opinion joined by Justice White and Justice Stevens,

held that the First Amendment freedoms of speech and press "prohibit government from summarily closing courtroom doors which had long been open to the public at the time the Amendment was adopted." 448 U.S. at 576, 100 S.Ct. at 2827. Justice Brennan, joined by Justice Marshall, concurred in the judgment, agreeing that the First Amendment "secures the public an independent right of access to trial proceedings." 448 U.S. at 585, 100 S.Ct. at 2831. Justice Stewart, concurring in the judgment, wrote that "the First and Fourteenth Amendments clearly give the press and the public a right of access to trials themselves, civil as well as criminal." 448 U.S. at 599, 100 S.Ct. at 2839. Justice Blackmun also concurred in the judgment, noting that "the First Amendment must provide some measure of protection for public access to the trial." 448 U.S. at 604, 100 S.Ct. at 2842.

disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest.

457 U.S. at 606–07, 102 S.Ct. at 2619–20. The Massachusetts closure statute was not "narrowly tailored," the Court ruled, because the state interest in protecting minor victims "could be served just as well by requiring the trial court to determine on a case by case basis" whether trials should be closed. 457 U.S. at 609, 102 S.Ct. at 2621. The Court held flatly that "a mandatory rule, requiring no particularized determinations in individual cases, is unconstitutional." 457 U.S. at 611 n. 27, 102 S.Ct. at 2622 n. 27.

The Court followed the same approach in *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*Press–Enterprise I*). In that case, the Court determined that a trial judge had violated the constitution by closing voir dire and suppressing the transcript, without attempting to limit its order to information that was actually sensitive and deserving of privacy protection, and without considering whether alternative means were available for protecting the interests and anonymity of prospective jurors.

More recently, in *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press–Enterprise II*), the Court applied the right of access to preliminary hearings in California criminal proceedings. The Court again stressed that the proceedings could not be closed "unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " 106 S.Ct. at 2743 (citations omitted). The Supreme Court noted that California courts "failed to consider whether alternatives short of complete closure would have protected the interests of the accused." *Id.*

Taken together, these cases clearly forbid a blanket closure rule. When the public has a right of access to judicial proceedings, the courtroom doors may not be closed without a particularized determination that, in the specific case under consideration, closure is the least restrictive way of protecting a compelling state interest.

### III.

■ The Supreme Court has not yet ruled on whether the First Amendment right of access extends to judicial documents, such as the dockets and files at issue here. But several circuit courts—including the First Circuit—have held that the access right does cover judicial documents and records, at least in criminal proceedings. *See In re Globe Newspaper Co.,* 729 F.2d 47, 51, 59 (1st Cir.1984) (the First Amendment right of access "has also been extended to documents filed in pretrial proceedings," and applies specifically "to bail hearings and to documents filed in support of the parties' arguments at those hearings"). *Accord: In re Washington Post Co.,* 807 F.2d 383, 390 (4th Cir.1986) ("the First Amendment right of access applies to documents filed in connection with plea hearings and sentencing hearings in criminal cases, as well as to the hearings themselves"); *United States v. Smith,* 776 F.2d 1104, 1111–12 (3d Cir.1985) (public access to bill of particulars was protected by First Amendment; "[a]lthough those [Supreme Court] cases concerned access to judicial proceedings, no reason occurs to us why their analysis does not apply as well to judicial documents"); *United States v. Peters,* 754 F.2d 753, 763 (7th Cir.1985) (access right of public and press to judicial records "is of constitutional magnitude through the First Amendment"); *Associated Press v. United States District Court,* 705 F.2d 1143, 1145 (9th Cir.1983) ("the public and press have a first amendment right of access to pretrial documents in general").[3]

---

**3.** These decisions should be distinguished from other cases, such as *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306 55 L.Ed.2d 570 (1978), holding that the access right of the press to certain trial documents is no

*greater* than that of the public. In *Nixon,* the electronic media sought to copy, broadcast and sell portions of the Watergate tapes introduced into evidence at a criminal trial. Both press and public were allowed to listen to the tapes

Extending the access right to judicial records makes sense. As a practical matter, it is physically impossible for an interested individual, or even a newspaper, to monitor every proceeding scheduled in every courtroom. Realistically, the press and public must rely upon documents filed by the parties in order to understand what has taken place in court. A statute foreclosing access to these documents, and to the docket which records their filing, bars the public from the only reliable means of knowing what has occurred during the course of a proceeding.

Given the premise that the public, and the press as the public's representative, have a right to know what is going on during a court hearing, there is no reason why that right should be eliminated or subordinated merely because a verdict has been rendered. The legitimate interest of press and public in knowing what has transpired in court continues even after the proceedings have adjourned.

The rationale that supports the right of access to trial proceedings themselves, *see Globe Newspaper Company v. Superior Court*, 457 U.S. at 605–06, 102 S.Ct. at 2619–20, is relevant as well to the question of whether underlying court documents should be available for public scrutiny. Indeed, the public historically has had a common law right of access to judicial records. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 1311, 55 L.Ed.2d 570 (1978) ("courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents.") (footnote omitted); *F.T.C. v. Standard Financial Management Corp.*, 830 F.2d 404, 408 (1st Cir.1987) (presumption of public access exists, in civil proceedings, for "materials on which a court relies in determining the litigants' substantive rights"). And, public scrutiny of criminal trials can only be informed and enhanced by public

access to related records, which "are often important to a full understanding of the way in which 'the judicial process and the government as a whole' are functioning," *Associated Press v. United States District Court*, 705 F.2d at 1145.

The argument for public access to court documents is particularly strong where, as here, the subject of press attention is the performance of the judicial system itself. As the Supreme Court has stated, "public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government." *Globe Newspaper Co. v. Superior Court*, 457 U.S. at 606, 102 S.Ct. at 2620 (footnote omitted). By investigating the processing of criminal cases involving topics such as child sexual abuse, and cases in which a defendant is a police officer, the press furthers "the free discussion of governmental affairs," thus helping to "ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government," *see id.*, 457 U.S. at 604, 102 S.Ct. at 2619.

In order for the public to evaluate intelligently the *performance of prosecutors and judges* in controversial cases, it is essential that it have access to judicial records, as well as to the trial proceedings themselves.

### IV.

■ Because the First Amendment access right applies to criminal dockets and files, the state must meet the criteria set forth in *Richmond Newspapers* and its progeny before ordering them sealed. As discussed above, those cases require an individualized determination that sealing is essential to preserve a compelling state interest; that no reasonable alternative to sealing the records is adequate; and that the closure order is narrowly tailored to

---

and report on their content. Transcripts of these tapes were also made available to the public. The Supreme Court held that the constitution did not require the tapes to be made available for copying, stressing that "[t]here simply were no restrictions upon press access

to, or publication of, any information in the public domain." *Id.* at 609, 98 S.Ct. at 1318. Here, in contrast, the question is whether the public and press have a constitutional right to inspect certain judicial documents.

serve the state interest advanced. *See, e.g., Press–Enterprise II,* 106 S.Ct. at 2743.

Section 100C does not meet this constitutional standard. Instead of providing for an individualized determination in each case, the statute requires the sealing of all records in every case to which it applies. Rather than tailoring the closure to the need asserted, § 100C seals every record, regardless of the underlying circumstances or the opportunity to protect privacy interests through the issuance of a responsive redaction order by the court.[4]

Defendants argue that § 100C can be construed constitutionally, if read in conjunction with the Criminal Records and Information Act ("CORI"), Mass.Gen.L. ch. 6, §§ 167–176, and the Supreme Judicial Court's decision in *Ottaway Newspapers, Inc. v. Appeals Court,* 372 Mass. 539, 551, 362 N.E.2d 1189 (1977) ("a stranger seeking relief against an impoundment order may bring a civil action in the court which issued it, joining the clerk of that court in his official capacity and the parties to the action"). Defendants urge that § 100C be viewed as imposing an interim sealing order, which any party may challenge through the mechanisms described above. According to defendants, both CORI and the civil action contemplated in *Ottaway Newspapers* provide for the sort of individualized weighing required by the First Amendment. This court disagrees.

On its face, § 100C provides for no exceptions, given a not guilty verdict, a no bill, or a finding of no probable cause.[5] The language of the statute is mandatory. The commissioner of probation "shall seal said court appearance and disposition," and the court clerks "shall likewise seal the records of the proceedings in their files."[6] Neither the relevant statutes,[7] nor the applicable state court decisions,[8] contain any indication that CORI[9] or *Ottaway Newspa-*

---

**4.** For example, plaintiffs point out that defendants could release some docket information in redacted form, with the names of acquitted defendants blanked out. Careful redaction could ensure that no individual defendant's identity is discoverable from the records. Compared to the blanket sealing required by § 100C, release of redacted material is clearly a less restrictive means of advancing the state interest in the privacy of former defendants.

**5.** The second paragraph of section 100C, which applies to nolle prosequis or dismissals entered by the court, appears to contain an exception for certain cases where "it appears to the court that substantial justice will be served".

**6.** *See, e.g., Globe Newspaper Co. v. Superior Court,* 379 Mass. 846, 862–63, 401 N.E.2d 360 *remanded* 449 U.S. 894, 101 S.Ct. 259, 66 L.Ed. 2d 124 (1980), *aff'd* 383 Mass. 838, 423 N.E.2d 773 (1981), *rev'd* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (in statute providing that "the presiding justice shall exclude the general public" from sex offense trials, the word "shall" construed as imposing mandatory obligation). *See also Commonwealth v. Vickey,* 381 Mass. 762, 767, 412 N.E.2d 877 (1980) ("a basic tenet of statutory construction is to give the words their plain meaning in light of the aim of the Legislature, and when the statute appears not to provide for an eventuality, there is no justification for judicial legislation.").

**7.** There is no reported decision construing the reach of § 100C, vis-a-vis CORI or *Ottaway Newspapers.* In *Police Commissioner of Boston v. Municipal Court,* 374 Mass. 640, 648, 374 N.E.2d 272 (1978), the Supreme Judicial Court explained that the term "sealing", as used in statutes such as § 100C, "refers to those steps taken to segregate certain records from the generality of records and to ensure their confidentiality to the extent specified in the controlling statute." In the instant case, the "controlling statute" that imposes the sealing requirement is § 100C.

**8.** Defendants assert that *Commonwealth v. McDuffee,* 7 Mass.App. 129, 135, 386 N.E.2d 754, *rev'd on other grounds,* 379 Mass. 353, 398 N.E. 2d 463 (1979), reads § 100C as requiring a balancing of public and private interests. In fact, the passage cited by defendants refers not to § 100C itself, but rather to the policy behind § 100C, considered independent of any statute. *See id.,* 7 Mass.App. at 135, 386 N.E.2d 754 ("even if such a policy behind sealing criminal records did come into play …"). Section 100C did not apply to McDuffee's records, *id.* ("It is not asserted that defendant's records were sealed …").

**9.** Indeed, three justices of the Supreme Judicial Court have expressed the opinion that CORI places excessive restrictions upon the public's access to judicial records. *See New Bedford Standard–Times Publishing Co. v. Clerk of the Third District Court,* 377 Mass. 404, 418, 387 N.E.2d 110 (concurring opinion of Abrams, J., joined by Quirico and Liacos, JJ.) ("CORI enshrouds certain records of proceedings in the judicial branch in secrecy and darkness … [I]n urban courts … the CORI requirement amounts to a virtual impoundment of records concerning all but the most recent cases.").

*pers* [10] can trump § 100C.

Even if § 100C were interpreted as defendants suggest, it would still unacceptably abridge plaintiffs' First Amendment access rights. The statute would continue to be construed so as to seal court records automatically. And so, one seeking access to the records would be required to launch a legal or administrative action in order to unseal them. Records would be closed in the first instance, and the state's policy of closure would remain effective unless an applicant could prove that closure was unjustified in a particular case.

The First Amendment, in contrast, establishes a constitutional policy favoring access—a "presumption of openness", *Press–Enterprise I*, 464 U.S. at 510, 104 S.Ct. at 824; *Globe Newspaper Company*, 457 U.S. at 610, 102 S.Ct. at 2622; *Richmond Newspapers*, 448 U.S. at 573, 100 S.Ct. at 2825 (plurality opinion). A judicial ruling is necessary, under the First Amendment standard, before court proceedings may be closed. The public is not required to obtain court permission to exercise its First Amendment right of access. This rationale dictates that the burden of seeking judicial intervention should also be on those who would deny access to judicial records, not on members of the public and press seeking access.

This is not to say that the public has an unconditional right of access to court records, including the names of defendants. The Supreme Court decisions suggest that access to judicial records may be denied "[i]n individual cases, and under appropriate circumstances", *Globe Newspaper Company*, 457 U.S. at 611 n. 27, 102 S.Ct. at 2622 n. 27.

Before denying access to records, however, a court must determine that sealing is necessary to protect a compelling state interest (such as the protection of an acquitted defendant's privacy), and that the particular seal order imposed has been narrowly tailored, so as not to infringe upon the

First Amendment rights of press and public any more than is necessary to protect the state's interest. *Press–Enterprise II*, 106 S.Ct. at 2744; *Press–Enterprise I*, 464 U.S. at 510, 104 S.Ct. at 824; *Globe Newspaper Company*, 457 U.S. at 609, 102 S.Ct. at 2621. Those urging that records be sealed must show that access will in fact threaten the state interests in question. *See Press–Enterprise I*, 464 U.S. at 510–11, 104 S.Ct. at 824–25 ("the California court's conclusion that Sixth Amendment and privacy interests were sufficient to warrant prolonged closure was unsupported by findings showing that an open proceeding in fact threatened those interests; hence it is not possible to conclude that closure was warranted.") (footnotes omitted).

 A court's findings denying access must be made on a particularized, case-by-case basis, *Globe Newspaper Company*, 457 U.S. at 611 n. 27, 102 S.Ct. at 2622 n. 27. Likewise, the findings must be "specific enough that a reviewing court can determine whether the closure order was properly entered", *Press–Enterprise I*, 464 U.S. at 510, 104 S.Ct. at 824. Before denying access, the court must consider all alternatives to closure, *Press–Enterprise I*, 464 U.S. at 513, 104 S.Ct. at 825, even if they are "cumbersome", *Press–Enterprise II*, 106 S.Ct. at 2744.

 The imposition of a seal order may never be automatic, *Press–Enterprise II*, 106 S.Ct. at 2744, summary or arbitrary, *Richmond Newspapers*, 448 U.S. at 576–77, 100 S.Ct. at 2826–27. Nor may it be supported by conclusory assertions, *Press–Enterprise II*, 106 S.Ct. at 2744.

### V.

Section 100C deprived plaintiffs of their First Amendment right of access by sealing judicial records without the particularized findings outlined above. Defendants, therefore, may not rely on § 100C in deny-

---

**10.** *Ottaway Newspapers* concerned a judicially-imposed impoundment order, not a sealing pro-

cess mandated by statute.

ing plaintiffs access to the requested material.

An order will issue.