**UNITED STATES of America**

v.

**David R. MARTIN, John M. Morway, Jeffrey Barry, George Vasiliades, et al.**

**Crim. No. 88–85–T.**

United States District Court, D. Massachusetts.

May 3, 1988.

Mitchell Dembin, Boston, Mass., for U.S.

Anthony Traini, Leppo & Traini, Randolph, Mass., for David R. Martin.

James Lawson, Martin Weinberg, Oteri, Weinberg & Lawson, Boston, Mass., for John M. Morway.

John McBride, Boston, Mass., for Jeffrey Barry.

Barry Haight, Buckley, Haight, Muldoon, Milton, Mass., for William Gorgeau.

Judith H. Mizner, Boston, Mass., Louis Vernell, North Miami Beach, Fla., for Nicholas Defrancesca.

Karnig Boyajian, Boston, Mass., for Randy Ray.

George Gormley, William D. Crowe, Boston, Mass., for Donald H. Gagnon.

Charles F. Dalton, Andover, Mass., for Jody Yameen.

Gerard R. Laflamme, Haverhill, Mass., for Michael Fasulo.

Elliot Weinstein, Boston, Mass., for George J. Vasiliades.

George O. Gregson, Saugus, Mass., Ira Feinberg, Boston, Mass., for Mark W. Borgesi.

Steven M. Gordon, Concord, N.H., for James M. Kattar.

Frank Mondano, Balliro, Mondano & Balliro, Boston, Mass., for Scott Rosenfeld.

John H. Lachance, Framingham, Mass., for Randy Martin.

George F. Gormley, Boston, Mass., Brian Gilligan, Milton, Mass., for Vernard Hester.

John A. Macoul, Salem, N.H., for Dennis Reidy.

Robert J. Wheeler, Boston, Mass., for Robert A. Murabito.

Carmine W. DiAdamo, Lawrence, Mass., for David M. Nardone.

Stephen P. Colella, Haverhill, Mass., for Patrick J. Nolan.

Hector deJesus, Everett, Mass., Vincent J. Nardi, Manchester, N.H., for Brenda Soares.

Ronald I. Segal, Everett, Mass., for Scott Jaskoka.

Carmine W. DiAdamo, Lawrence, Mass., for Michael R. McCafferty.

Alfred Daniels, Andover, Mass., for Michael Neve.

No appearance for James Hajjar.

Robert Richman, Federal Defender's Office, Boston, Mass., for Kathryn St. Jean.

## MEMORANDUM

TAURO, District Judge.

A ten-count indictment charges defendants David Martin, John Morway, Jeffrey Barry, George Vasiliades, and twenty-one others, with various offenses relating to the possession and distribution of cocaine. On April 1, 1988, Magistrate Saris ordered Martin, Morway, Barry and Vasiliades detained prior to trial. All four moved for this court to review and revoke the magistrate's order. After an independent consideration of the evidence, this court denied the motions of Martin, Morway, and Barry, but ordered Vasiliades released on bond, subject to certain strict conditions.

### I.

In considering these pretrial detention orders, this court relied upon (1) tapes and transcripts of oral and wire communications intercepted under Title III, 18 U.S.C. § 2510 *et seq.;* and (2) an affidavit submitted by Herbert J. Lemon, Jr., special agent of the Drug Enforcement Administration, in support of the government's Title III request.

The tapes, transcripts and the affidavit have been sealed, pursuant to Title III, 18 U.S.C. § 2518(8)(b), which states:

Applications made and orders granted under this chapter shall be sealed by the judge. Custody of the applications and orders shall be wherever the judge directs. Such applications and orders shall be disclosed only upon a showing of good cause before a judge of competent jurisdiction, and shall not be destroyed except on order of the issuing or denying judge, and in any event shall be kept for ten years.

Representatives of various news media have moved for access to these materials. On April 4, Magistrate Saris heard arguments from counsel for WBZ–TV4, the *Boston Globe,* the *Boston Herald,* the *Lawrence Eagle–Tribune,* and defendants. On April 8, the magistrate issued an order, and a report and recommendation. The magistrate's order denied the motion for press access to the tapes and transcripts. She recommended, however, that Agent Lemon's affidavit be released to the press, in redacted form.

Defendant Vasiliades filed a timely objection to the magistrate's recommendation, in which defendants Martin and Morway

joined.[1] This court heard arguments of counsel on April 29.

## II.

■ The public, and the press as its representative, have a First Amendment right of access to criminal proceedings. *See Richmond Newspapers v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*Press–Enterprise I*); and *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press–Enterprise II*). This right applies, in particular, "to pretrial proceedings setting and modifying bail, and to the documents on which the bail decisions are based." *In re Globe Newspaper Company,* 729 F.2d 47, 52 (1st Cir.1984).

■ In a recent opinion, this court discussed at length the public's right of access to documents and records related to criminal proceedings. *See Globe Newspaper Company v. Pokaski,* 684 F.Supp. 1132 (D.Mass.1988). The court concluded that access to such documents may not be foreclosed without a particularized determination that, in the specific case under consideration, closure is the least restrictive way of protecting a compelling state interest. *Globe Newspaper Company v. Pokaski,* 684 F.Supp. 1132, 1134, 1135 (D.Mass.1988). Those urging that records be sealed must show that access will in fact threaten the state interests in question. *Id.,* at 1137. Before denying access, the court must consider all alternatives to closure, even if they are cumbersome. *Id.,* at 1137. The court's findings must be specific enough to permit appellate review. *Id.*

■ Magistrate Saris' report and recommendation is an example of the individualized attention required by the Supreme Court precedents, cited above and relied upon in *Globe Newspaper Co. v. Pokaski.* In addition, this court has independently examined the requested affidavit for the purpose of determining whether the public's First Amendment access right can be accommodated without jeopardizing defendants' Sixth Amendment right to a fair trial.

As a result of this particularized analysis, this court has determined that the Lemon affidavit may be released in redacted form without there being any prejudice to defendants' rights to a fair trial. Specifically, the Lemon Affidavit is redacted to eliminate all passages except those relied upon by this court in formulating its detention orders.[2] Compared to the alternative of keeping the affidavit under seal, "[c]areful redaction ... is clearly a less restrictive means of advancing the state interest," *Globe Newspaper Co. v. Pokaski,* at 1136 n. 4. Here, redaction will ensure that the public receives those portions of the affidavit in which it has a First Amendment interest. Material outside of the public's First Amendment interest will remain under seal.

The court has considered and is mindful of defendants' concern, expressed at hearing, that release of the Lemon affidavit will generate widespread publicity, thereby endangering defendants' right to a fair trial. But, the court is satisfied that, through careful and searching *voir dire* of prospective jurors, defense counsel and the court can ensure that no juror is influenced by adverse publicity resulting from the affidavit's release. *See Press–Enterprise II,* 106 S.Ct. at 2744 ("this risk of prejudice does not automatically justify refusing public access to hearings on every motion to suppress. Through *voir dire,* cumbersome as

---

1. Representatives of the news media have not objected to the magistrate's denial of their request for access to the tapes and transcripts. This court, therefore, limits its consideration to the Lemon Affidavit, which contains no material derived from Title III interceptions. *Cf. In re Globe Newspaper Co.,* 729 F.2d 47, 54 (1st Cir. 1984) (Fourth Amendment rights of defendants support Title III requirement that public disclosure of interceptions be prohibited prior to suppression hearing).

2. The same passages were considered by the magistrate in formulating her detention order.

it is in some circumstances, a court can identify those jurors whose prior knowledge of the case would disable them from rendering an impartial verdict.")

## III.

In sum, the public has a First Amendment right to view those portions of the Lemon affidavit relied upon in pretrial detention decisions, and defendants' Sixth Amendment rights may be protected by means short of sealing the entire affidavit. This court finds, therefore, that the relevant circumstances discussed above amount to "good cause," within the meaning of Title III,[3] for release of the Lemon affidavit in redacted form.[4]

An order has issued.[5]

## ORDER

For the reasons stated in the accompanying memorandum, the court orders release of the requested affidavit in redacted form.

It is so ordered.

## APPENDIX ■

### AFFIDAVIT OF SPECIAL AGENT HERBERT J. LEMON, JR.

SUFFOLK, ss.

Boston, Massachusetts

I, Herbert J. Lemon, Jr., being duly sworn, depose and state as follows:

[[ ]]

## THE INVESTIGATION

8. On April 19, 1987, at Logan International Airport, Boston, Massachusetts, MSP officers seized $189,820 in cash from David R. Martin, John Morway and Alfio Lupo.

The seizure was prompted by the discovery by security guards for Delta Air Lines of $64,820 concealed within a hollowed-out hard-cover book carried by Morway. The security guards notified the MSP. Morway voluntarily accompanied Staff Sergeant Carmen Tamarro to the MSP office. In response to questioning, Morway identified himself and said that the money was not his but belonged to three or four other guys who he declined to identify. Morway said that he was enroute to Fort Lauderdale, Florida, to purchase a condominium for $130,000. He stated that he did not know how much money he was carrying. Morway stated that he was unemployed.

9. While Sgt. Tamarro was interviewing Morway, Delta security notified the MSP that it had discovered another person travelling with a large amount of cash. At the security desk, Martin and Lupo agreed to accompany Trooper McCue to the Massachusetts State Police Airport Office. Martin was discovered to be carrying $125,000 in cash also concealed in a hollowed-out book. Martin was travelling under the name David Morway. Lupo was not carrying cash, but was travelling under the name Al Morway. All three tickets were one-way to Fort Lauderdale and were charged to John Morway's American Express account. All three persons possessed licenses to carry firearms.

10. Upon further questioning, Morway admitted that he was travelling with Martin and Lupo. Morway said that he had checked luggage and that Martin and Lupo had the claim tickets. Martin and Lupo denied having or checking luggage. Martin and Lupo correctly identified themselves. Martin admitted that all of the

3. *Cf. United States v. Ferle,* 563 F.Supp. 252, 253 (D.R.I.1983) (the desire of the news media to print the contents of a sealed application, standing alone, does not constitute good cause).

4. The magistrate recommended that two sentences in the Lemon Affidavit, relevant to her recommendation and to this court's pretrial detention decisions, nevertheless be redacted to protect defendant Martin's right to a fair trial. Upon consideration, this court concludes that defendant Martin's rights may be protected, without encroaching upon the public's First

Amendment rights, through the process of voir dire. These sentences, therefore, have not been redacted.

5. The redacted affidavit is an appendix to the order.

money was his and that he worked in insurance. He stated that he was enroute to Fort Lauderdale to buy a condominium at Galt Ocean Mile. Sgt. Tamarro contacted Officer M. Spero, a narcotics officer of the Haverhill, Massachusetts, Police Department, who stated that Martin was known to Spero and to confidential sources of Spero as a cocaine trafficker. The cash was seized for forfeiture and turned over to the DEA.

11. On April 21, 1987, as a result of the airport encounter, a search warrant was obtained for the residence of Martin, 9D Parkview Lane, Bradford, Massachusetts, from the Haverhill Division of the Massachusetts District Court. [[ ]] At the time of the execution of the warrant, officers seized, among other things, weapons, radio receivers, a ledger containing narcotics transaction records, more than $23,000 in cash, and amounts of illegal steroids and syringes. The ledger has been analyzed by an FBI expert and reveals, among other things, that from about February, 1986, through April 19, 1987, Martin distributed approximately 30 kilograms of cocaine and received approximately $1,400,000 in exchange.

[[ ]]

13. A confidential informant (hereinafter "CI–1") has been providing information to the Massachusetts State Police about Martin and his associates. CI–1 has been cooperating with the MSP for approximately two years. CI–1's His cooperation has led to arrests, convictions and seizures of narcotics in three different cases. Information provided by CI–1 has not proved to be false and has been independently corroborated. As discussed below, however, other sources of information have indicated that CI–1 also is providing information to Martin. CI–1 has stated that CI–1 has known Martin for the past three years. CI–1 has purchased small amounts of cocaine from Martin at Martin's residence and has been present when Martin received cocaine. Specifically, in the fall of 1986, CI–1 was present at Martin's residence when Martin received approximately three

kilograms of cocaine from a couple in their late 30's who spoke with a British accent.

[[ ]]

16. During the second week of May 1987, CI–1 reported that Martin told CI–1, earlier that week, that in a month or so "the wheels would start turning faster than ever." Martin told CI–1 that at the time of the airport seizure, Martin was in the process of increasing the business. Martin said that when the business opens again, in a month or two, that Martin will no longer handle the cocaine directly, although he still will be the one making the deals. In discussing the airport seizure, Martin reportedly told CI–1 that the cops were stupid to grab Martin only for the money. According to CI–1, Martin said, "I'm the fucking kingpin and they didn't even know it." [[ ]]

17. During the third week of June 1987, CI–1 reported that CI–1 had met with Martin earlier that week at a nightclub. Martin told CI–1 that Martin was back in business with new people and that business will be bigger than ever.

[[ ]]

23. A second confidential informant (hereafter "CI–2") of the MSP also has provided information regarding Martin's cocaine organization. CI–2 has been cooperating for two months. During that time, however, information provided by CI–2 has led to two arrests and seizures of cocaine. All information provided to date by CI–2 has proven to be reliable and has been corroborated independently. CI–2 has reported that from April through September 1987, CI–2 purchased approximately five (5) kilograms of cocaine from Martin. According to CI–2 the first deal occurred in April 1987, within a few days after April 19, 1987, the date of the cash seizure at Logan Airport. The deal was for one kilogram of cocaine and was arranged as follows: CI–2 telephoned Martin at his residence and, using a pre-arranged code, ordered one kilogram. CI–2 explained that the code was that the numerical figure was to represent the quantity and that the substance discussed was irrelevant. Martin told CI–2 to come to Martin's residence.

At the residence, Martin told CI–2 the price, $22,000, and took a down payment. Martin gave CI–2 a car telephone number for his delivery man and told CI–2 to call that number at an arranged time. Upon calling that number, CI–2 was told where and when the delivery would occur. CI–2 would go to the location, receive the cocaine, pay the balance and leave. For each transaction thereafter, virtually the same scenario was followed. The only variations were that on rare occasions, the arrangements initially were made with Morway and, on occasion, the money sometimes would be paid after delivery to Martin or Morway. [[ ]]

24. CI–2 reported that his last cocaine transaction with Martin was to occur on September 25, 1987. On that date, CI–2 followed the same pattern as in earlier transactions and was to purchase one-half kilogram of cocaine for $10,500. When CI–2 arrived at Martin's apartment, the $10,500 was counted by Martin and Morway in Martin's bathroom. After CI–2 left Martin's apartment, the transaction was cancelled because they believed they were under surveillance. In fact, unknown to CI–2 and Martin, DEA agents and MSP officers were surveilling Martin's residence and observed CI–2 arrive and leave. CI–2 was not cooperating with the MSP at that time. Independently, CI–1 also reported that Martin told CI–1 that Martin thought he was being watched that day.

[[ ]]

28. On December 22, 1987, in the morning, Philip C. Ekstrand (see ¶ 18 above) flew to Fort Lauderdale, Florida, from Boston on Eastern Air Lines. [[ ]]

29. Upon Ekstrand's arrival at Logan Airport, he was observed by law enforcement authorities retrieving a large suitcase. After retrieving the suitcase, Ekstrand was approached by DEA agents and consented to a search of the suitcase. The suitcase contained approximately six (6) kilograms of cocaine. Ekstrand was arrested and charged. His case carries Criminal No. 87–392–WF.

30. Ekstrand confessed and has stated that this was his third trip for Martin. He stated that he was telephoned by Martin and told that Morway would be calling. Morway called and told Ekstrand to pick up the money from [[ ]] Ekstrand picked up the money from [[ ]] at [[ ]] residence and then obtained a suitcase from [[ ]] Ekstrand then met with Barry who told Ekstrand to deliver two kilograms to Barry upon Ekstrand's return. Ekstrand was met in Florida by Martin and ultimately obtained the cocaine from a source identified as "Nick." Ekstrand was arrested upon his return.

31. [[ ]] On the second trip, he retained the cocaine and delivered it to such persons and in such quantities as directed by Martin. Ekstrand stated that since his arrest, he has been told by Martin that CI–1 is working for the police and for Martin. Martin told Ekstrand that CI–1 came to Martin's apartment wired and showed the wire to Martin. In fact, following Ekstrand's arrest, CI–1 was instructed to approach Martin and attempt to purchase cocaine from Martin. On December 28, 1987, CI–1 went to Martin's residence. [[ ]] Morway left just after CI–1's arrival. CI–1 asked Martin for "something." Martin replied that he could not do anything, that people think he does stupid things, but he does not.

[[ ]]

34. Another confidential informant (hereafter "CI–4") has been providing information to the New Hampshire State Police for over one year. Information received from CI–4 has proven to be reliable and has led to several arrests and the seizure of approximately 2 kilograms of cocaine. Information provided by CI–4 has been independently corroborated. CI–4 has reported that in late January 1988, CI–4 received approximately one pound of cocaine from Jeffrey Barry for sale on consignment. Barry told CI–4 that Barry wanted $12,500 for the pound if CI–4 sold all of it. Barry gave CI–4 a digital scale as well. Barry told CI–4 that Barry was off to Puerto Rico and would call upon his return. Barry told CI–4 that this was part of a "team operation" now.

35. On about February 1, 1988, Barry called CI–4 and asked for money for the pound. On February 2, 1988, CI–4 met with Barry and, in a recorded conversation, Barry asked for $6,250 and the remainder of the unsold cocaine. Later that day, CI–4 met with Barry at Barry's residence and, in a recorded conversation, gave Barry $6,250. Barry told CI–4 that he still owes $6,500. [[ ]]

36. Another confidential informant (hereinafter "CI–5") has been providing information to the MSP regarding the Martin organization. CI–5 was acquired as a source in January 1988, and is of unknown reliability. The information provided by CI–5 to date, however, has been corroborated independently by other informants, pen register information and by officers assigned to this investigation. According to CI–5, CI–5 has been employed by Barry to make deliveries of cocaine for Barry. On or about February 1, 1988, CI–5 observed about $50,000 in cash in Barry's residence. [[ ]] CI–5 stated that CI–5 has made deliveries which Barry told CI–5 were for David Martin. CI–5 has delivered cash for Barry to Morway on two occasions. CI–5 reported that in January 1988, Barry himself brought three kilograms of cocaine from Florida into Bradley International Airport in Connecticut. CI–5 was given two kilograms by Barry to hold for cutting and delivery to customers.

[[ ]]

38. Analysis of Martin's outgoing calls from October 23, 1987, to February 29, 1988, discloses the following:

[[ ]]

b. About 135 calls to (603) 595–2806 (Morway residence) and most recently February 29, 1988;

c. About 76 calls to (617) 372–8593 (Barry residence) and most recently February 29, 1988;

[[ ]]

39. A court-authorized pen register also has been employed on Barry's telephone from October 23, 1987, to December 23, 1987, and again from January 4, 1988, to date. Analysis of that pen register, through February 29, 1988, reveals the following:

[[ ]]

c. About 12 calls to (603) 595–2806 (Morway residence) and most recently December 22, 1987;